[No. S043065. Aug. 28, 1995.]

ALLIANCE MORTGAGE COMPANY, Plaintiff and Appellant, v.
LAURIE SAMUEL ROTHWELL et al., Defendants and Respondents.

## COUNSEL

Morgenstein & Jubelirer, Jean L. Bertrand and Robert B. Mullen for Plaintiff and Appellant.

Edward D. Benes, Terrance P. Huber, Landels, Ripley & Diamond, Bruce W. Hyman, Margaret P. Reidy, Evans, Latham, Harris & Campisi, Jamie O. Harris, Charles P. Wolff and Nancy M. Levin as Amici Curiae on behalf of Plaintiff and Appellant.

Dinkelspiel, Donovan & Reder, Joel Zeldin, Leon M. Bloomfield, Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, Paul J. Matzger, Miller, Starr & Regalia, Edmund L. Regalia, Daniel R. Miller and Kenneth R. Styles for Defendants and Respondents.

## OPINION

**ARABIAN, J.**—We here determine whether a lender's acquisition of security property by full credit bid at a nonjudicial foreclosure sale bars the lender as a matter of law from maintaining a fraud action against third party nonborrowers who fraudulently induced the lender to make the loans. The Courts of Appeal are in conflict on this issue. We granted review to resolve the conflict, and now conclude that such an action is not precluded. We therefore affirm the judgment of the Court of Appeal.

### I. FACTS AND PROCEDURAL BACKGROUND

This matter reaches us following plaintiff Alliance Mortgage Company's (Alliance) successful appeal from a judgment on the pleadings dismissing all

of its causes of action against defendants Pioneer Title Company of California, now known as North American Title Company (North American), and Ticor Title Insurance Company, Inc. of California (Ticor). Accordingly, for purposes of this opinion, we treat the properly pleaded allegations of Alliance's complaint as true, and also consider those matters subject to judicial notice. (*Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 714-715, fn. 3 [117 Cal.Rptr. 241, 527 P.2d 865]; *Hunt* v. *County of Shasta* (1990) 225 Cal.App.3d 432, 440 [275 Cal.Rptr. 113]; *April Enterprises, Inc.* v. *KTTV* (1983) 147 Cal.App.3d 805, 815 [195 Cal.Rptr. 421].) "Moreover, the allegations must be liberally construed with a view to attaining substantial justice among the parties." (*Guild Mortgage Co.* v. *Heller* (1987) 193 Cal.App.3d 1505, 1508 [239 Cal.Rptr. 59] (*Guild Mortgage*).) "Our primary task is to determine whether the facts alleged provide the basis for a cause of action against defendants under any theory." (*Ibid.*)

From 1983 through 1985, defendant Laurie Samuel Rothwell (Rothwell), a real estate appraiser and broker, and other defendants including North American and Ticor, devised and implemented an elaborate scheme to fraudulently induce Alliance, then known as Charter Mortgage Company of Florida, to lend money for the purchase of nine Bay Area residences. In furtherance of this plan, two fictitious, nonexistent companies, American Medical Laboratories and American International Savings and Loan, were created to falsely verify employment of and deposits by purported loan applicants. Defendants committed some or all of the following fraudulent acts regarding each property: prepared false residential purchase agreements and loan applications in the names of fictitious borrowers, deliberately inflated "fair market value" property appraisals and invented "comparable" property values to support the inflated and fraudulent appraisals, falsified employment and deposit verifications, tax returns, credit histories, and W-2 wage/income statements, drafted inaccurate title reports that contained misleading descriptions of the properties, and falsely represented that the escrow instructions had been followed and the required cash deposits and disbursements made.

Five of the properties were located on Haight Street in San Francisco; the other four were located in various East Bay communities. Ticor issued title insurance policies on three of the five Haight Street properties which falsely described them as being four-unit dwellings. In fact, they were one-unit residences.

Relying on defendants' representations, and unaware of their fraudulent conduct, Alliance loaned the Rothwell group the funds to purchase the Haight Street and East Bay properties. The loans were secured by deeds of trust to the respective properties. Not surprisingly, the fictitious borrowers

defaulted. Alliance purchased many of the properties at nonjudicial foreclosure sales by bidding the full credit value of the outstanding indebtedness on the notes, plus interest and costs.[1]

Alliance "discovered, upon acquiring title to the properties, that the true market value of the properties was far less than the value represented to Alliance and, at the time of the foreclosures, remained far less than the outstanding principal amount of the loans together with all other expenditures. Alliance has in some cases discovered that the physical improvements actually constructed on the separate parcels of real property are not the type of improvements as assured in the title insurance policies. As a proximate result of defendants' misconduct, described above, Alliance has been damaged in an amount to be determined."

Prior to learning of the fraud, Alliance sold several loan obligations to secondary investors. In the case of three of these properties, regulations of the Federal Home Loan Mortgage Corporation (FHLMC) required Alliance to repurchase the loans it had earlier sold to the Federal National Mortgage Association (FNMA). "Each of those loans had gone into default and the properties were foreclosed upon before Alliance repurchased them."

After foreclosure or repurchase of the loans from a secondary investor, Alliance was required to pay various costs and expenses through the time it resold the property, including property taxes, repairs to the property, correction of local housing code violations, maintenance of the property, applicable insurance, and costs associated with selling the property. In addition, after discovery of the fraud perpetrated by defendants, some of Alliance's mortgage insurers denied coverage for Alliance's losses.

Alliance alleged that these facts gave rise to claims for intentional misrepresentation, negligent misrepresentation, breach of contract against the escrow defendants, including North American, breach of Ticor's title insurance contract, breach of fiduciary duty against the escrow defendants, breach of fiduciary duty against the title insurance defendants, and violation of the federal Racketeer Influenced and Corrupt Organization Act (18 U.S.C. §§ 1961-1968). It sought punitive damages on its intentional misrepresentation claim, and attorney fees, costs, and interest on its breach of contract and breach of fiduciary duty claims.

North American and Ticor moved to strike portions of the second amended complaint on the ground that they were barred by Alliance's full

---

[1] The second amended complaint does not allege the amount of Alliance's bids. The trial court took judicial notice of the amount of the bids from public records, and here Alliance implicitly concedes that it made full credit bids.

credit bids. In opposing the motions, Alliance argued that it was not seeking impairment of security damages, and that its full credit bids did not bar an action for fraud committed by third parties. The trial court granted the motions to strike, concluding that Alliance's full credit bids barred claims for damages resulting from fraudulent representations as to the adequacy of the security.

Prior to trial, Alliance moved to amend the complaint to conform to proof that defendants' fraud resulted in damage to Alliance's goodwill, reputation, and net worth. At or about the same time, defendants filed motions *in limine* to exclude all evidence of impairment of security, damages for loss of goodwill, reputation, and net worth, and damages for postforeclosure costs. Ticor also filed separate motions *in limine,* some of which sought judgment on the pleadings, arguing that it had been improperly joined as a Doe defendant, that the statute of limitations had run, and that its title insurance policies were indemnification contracts that did not constitute representations regarding the property. The trial court granted defendants' motions, denied Alliance's motion to amend, and entered judgment in favor of defendants on all causes of action.

Alliance appealed, and the Court of Appeal reversed. Expressly disagreeing with *Western Fed. Savings & Loan Assn. v. Sawyer* (1992) 10 Cal.App.4th 1615 [13 Cal.Rptr.2d 639] and *GN Mortgage Corp. v. Fidelity Nat. Title Ins. Co.* (1994) 21 Cal.App.4th 1802 [27 Cal.Rptr.2d 47], the Court of Appeal held that a lender can state a cause of action for fraud against third parties for fraudulently inducing a loan secured by real property despite the fact that the lender acquired the property after making a full credit bid. The Court of Appeal further held that Alliance's action against Ticor was not barred by the statute of limitations because Alliance's pleadings did not establish that Alliance had been aware of Ticor's involvement in Rothwell's scheme. The Court of Appeal also concluded that Alliance had stated a cause of action against Ticor for intentional and negligent misrepresentation because, although a title insurance policy is an indemnification contract and not a guarantee of title, Alliance's reliance related not to the condition of title but to the nature and description of the property securing the loans. Ticor's petition for rehearing was denied.

We granted North American and Ticor's petitions for review solely on the issue of whether a lender's acquisition of security property by full credit bid at a nonjudicial foreclosure sale bars the lender from maintaining a fraud action to recover damages from nonborrower third parties who fraudulently induced the lender to make the loans. We now affirm.

## II. DISCUSSION

### A. *Background Principles*

The issue here is the effect of a lender's full credit bid at a nonjudicial foreclosure sale on its claim of fraud in the inducement of the underlying loan obligation. To understand the context in which this issue arises, and the competing legal and public policy arguments, we first briefly review certain background principles regarding mortgages and deed of trusts, the antideficiency statutes, the full credit bid rule, and fraud claims.

#### 1. *Mortgages and Deeds of Trust*

A real property loan generally involves two documents, a promissory note and a security instrument. The security instrument secures the promissory note. This instrument "entitles the lender to reach some asset of the debtor if the note is not paid. In California, the security instrument is most commonly a deed of trust (with the debtor and creditor known as trustor and beneficiary and a neutral third party known as trustee). The security instrument may also be a mortgage (with mortgagor and mortgagee, as participants). In either case, the creditor is said to have a lien on the property given as security, which is also referred to as collateral." (Bernhardt, Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 2d ed. 1990) § 1.3, p. 5, italics removed.)[2]

A security interest cannot exist without an underlying obligation, and therefore a mortgage or deed of trust is generally extinguished by either payment or sale of the property in an amount which satisfies the lien. (Civ. Code, §§ 2909, 2910;[3] see *Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 606 [125 Cal.Rptr. 557, 542 P.2d 981]; Bernhardt, Cal. Mortgage and Deed of Trust Practice, *supra*, § 1.10, p. 15; *id.*, § 6.16, p. 292.) In addition, merger of the lien and ownership of the property in one person or entity extinguishes the lien, unless it is necessary for the protection of the buyer's rights that the lien be sustained. (*Ralph C. Sutro Co.* v. *Paramount Plastering, Inc.* (1963) 216 Cal.App.2d 433, 438 [31 Cal.Rptr. 174]; see *First American Title Ins. Co.* v. *U.S.* (9th Cir. 1988) 848 F.2d 969, 971, applying California law ["The theory is that the mortgagee's lesser interest (the lien) has 'merged' into the greater interest (the fee)."].)

---

[2]The terms "deed of trust," "trustor," and "beneficiary" are used interchangeably in this opinion with "mortgage," "mortgagor," and "mortgagee." (Bernhardt, Cal. Mortgage and Deed of Trust Practice, *supra*, § 1.3, p. 5.)

[3]All statutory references contained herein are to the Civil Code unless otherwise indicated.

## 2. *Foreclosure and Antideficiency Statutes*

California has an elaborate and interrelated set of foreclosure and antideficiency statutes relating to the enforcement of obligations secured by interests in real property. Most of these statutes were enacted as the result of "the Great Depression and the corresponding legislative abhorrence of the all too common foreclosures and forfeitures [which occurred] during that era for reasons beyond the control of the debtors." (Hetland & Hansen, *The "Mixed Collateral" Amendments to California's Commercial Code—Covert Repeal of California's Real Property Foreclosure and Antideficiency Provisions or Exercise in Futility?* (1987) 75 Cal. L.Rev. 185, 187-188, fn. omitted.)

Pursuant to this statutory scheme, there is only "one form of action" for the recovery of any debt or the enforcement of any right secured by a mortgage or deed of trust. That action is foreclosure, which may be either judicial or nonjudicial. (Code Civ. Proc., §§ 725a, 726, subd. (a).) ■ In a judicial foreclosure, if the property is sold for less than the amount of the outstanding indebtedness, the creditor may seek a deficiency judgment, or the difference between the amount of the indebtedness and the fair market value of the property, as determined by a court, at the time of the sale. (*Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35, 43-44 [27 Cal.Rptr. 873, 378 P.2d 97].) However, the debtor has a statutory right of redemption, or an opportunity to regain ownership of the property by paying the foreclosure sale price, for a period of time after foreclosure. (Bernhardt, Cal. Mortgage and Deed of Trust Practice, *supra*, § 3.54, p. 143; *id.*, § 3.76, p. 173; *id.*, § 3.77, p. 174.)

■ In a nonjudicial foreclosure, also known as a "trustee's sale," the trustee exercises the power of sale given by the deed of trust. (Bernhardt, Cal. Mortgage and Deed of Trust Practice, *supra*, § 1.28, p. 37; *id.*, § 2.1, p. 51.) Nonjudicial foreclosure is less expensive and more quickly concluded than judicial foreclosure, since there is no oversight by a court, "[n]either appraisal nor judicial determination of fair value is required," and the debtor has no postsale right of redemption. (Sheneman, Cal. Foreclosure: Law and Practice (1994) § 6.01, p. 6-3.) However, the creditor may not seek a deficiency judgment. (*Roseleaf Corp.* v. *Chierighino, supra*, 59 Cal.2d at pp. 43-44.) Thus, the antideficiency statutes in part "serve to prevent creditors in private sales from buying in at deflated prices and realizing double recoveries by holding debtors for large deficiencies." (*Commonwealth Mortgage Assurance Co.* v. *Superior Court* (1989) 211 Cal.App.3d 508, 514 [259 Cal.Rptr. 425].)

The price at a foreclosure sale is not deemed the equivalent of the property's fair market value. As the United States Supreme Court recently

observed, "An appraiser's reconstruction of 'fair market value' could show what similar property would be worth if it did not have to be sold within the time and manner strictures of state-prescribed foreclosure. But property that *must* be sold within those strictures is simply *worth less*. No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques." (*BFP* v. *Resolution Trust Corp.* (1994) 511 U.S. __ [128 L.Ed.2d 556, 565, 114 S.Ct. 1757, 1762], italics in original.) ■ However, it is settled that "Where there is no irregularity in a nonjudicial foreclosure sale and the purchaser is a bona fide purchaser for value, a great disparity between the sales price and the value of the property is not a sufficient ground for setting aside the sale." (*Moeller* v. *Lien* (1994) 25 Cal.App.4th 822, 832 [30 Cal.Rptr.2d 777]; see *BFP* v. *Resolution Trust Corp.*, *supra*, 511 U.S. __ [128 L.Ed.2d at pp. 566-567, 114 S.Ct. at pp. 1763-1764] [So long as the state's requirements for conducting a foreclosure sale have been met, "mere inadequacy of the foreclosure sale price is no basis for setting the sale aside, though it may be set aside . . . if the price is so low as to 'shock the conscience or raise a presumption of fraud or unfairness.' "].)

A bid at a trustee's sale is deemed by statute to be an irrevocable offer by that bidder to purchase the property for that amount. (§ 2924h, subd. (a).) However, "[i]t is the general rule that courts have power to vacate a foreclosure sale where . . . the sale . . . is tainted by fraud . . . ." (*Bank of America etc. Assn.* v. *Reidy* (1940) 15 Cal.2d 243, 248 [101 P.2d 77]; *Karoutas* v. *HomeFed Bank* (1991) 232 Cal.App.3d 767, 774-775 [283 Cal.Rptr. 809].) The "doctrine of caveat emptor does not apply to nonjudicial foreclosure sales." (*Karoutas* v. *HomeFed Bank*, *supra*, 232 Cal.App.3d at p. 774.)

■ The antideficiency statutes have been broadly interpreted to protect the debtor. It is settled, however, and defendants here concede, that the antideficiency statutes do not preclude an action against a borrower for fraud in the inducement of a loan. (See, e.g., *Guild Mortgage*, *supra*, 193 Cal.App.3d at p. 1511 [it has long been recognized that antideficiency statutes do not preclude a fraud suit]; *Manson* v. *Reed* (1986) 186 Cal.App.3d 1493, 1501 [231 Cal.Rptr. 446] [recognized exception to the antideficiency statute is a suit for fraud]; *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 138-139 [135 Cal.Rptr. 802] [antideficiency statutes not available to trustor as a defense to an action by beneficiary for fraud; action for fraud is not action for deficiency judgment]; Fin. Code, §§ 779, 7460, 15102.) There are several reasons for this exception. First, "[a] suit for fraud obviously does not involve an attempt to recover on a debt or note. As such, it stands separate

and apart from any action which the antideficiency legislation seeks to preclude." (*Guild Mortgage, supra,* 193 Cal.App.3d at p. 1512; *Manson v. Reed, supra,* 186 Cal.App.3d at p. 1501 ["The distinction is that a suit for fraud is a completely separate remedy than a suit on the promissory note secured by the deed of trust."].) "Furthermore, the antideficiency laws were not intended to immunize wrongdoers from the consequences of their fraudulent acts. Finally, assuming that the court applies a proper measure of damages, fraud suits do not frustrate the antideficiency policies because there should be no double recovery for the beneficiary." (Sheneman, Cal. Foreclosure: Law and Practice, *supra,* § 6.18, p. 6-80, fn. omitted.)

### 3. *Full Credit Bid Rule*

At a nonjudicial foreclosure sale, if the lender chooses to bid, it does so in the capacity of a purchaser. (*Passanisi v. Merit-McBride Realtors, Inc.* (1987) 190 Cal.App.3d 1496, 1503 [236 Cal.Rptr. 59].) The only distinction between the lender and any other bidder is that the lender is not required to pay cash, but is entitled to make a credit bid up to the amount of the outstanding indebtedness. (*Ibid.; Cornelison v. Kornbluth, supra,* 15 Cal.3d at p. 607.) The purpose of this entitlement is to avoid the inefficiency of requiring the lender to tender cash which would only be immediately returned to it. (*Cornelison v. Kornbluth, supra,* 15 Cal.3d at p. 607.) A "full credit bid" is a bid "in an amount equal to the unpaid principal and interest of the mortgage debt, together with the costs, fees and other expenses of the foreclosure." (*Cornelison, supra,* 15 Cal.3d at p. 606, fn. 10.) If the full credit bid is successful, i.e., results in the acquisition of the property, the lender pays the full outstanding balance of the debt and costs of foreclosure to itself and takes title to the security property, releasing the borrower from further obligations under the defaulted note. (See *Smith v. Allen* (1968) 68 Cal.2d 93, 96 [65 Cal.Rptr. 153, 436 P.2d 65] ["[I]t is clear that the Legislature intended that a properly conducted [nonjudicial] foreclosure sale should constitute a final adjudication of the rights of the borrower and the lender."].)

Under the "full credit bid rule," when a lender makes such a bid, it is precluded for purposes of collecting its debt from later claiming that the property was actually worth less than the bid. (See *Cornelison v. Kornbluth, supra,* 15 Cal.3d at pp. 606-607; *Passanisi v. Merit-McBride Realtors, Inc., supra,* 190 Cal.App.3d at p. 1503 [after full credit bid, lender cannot pursue any other remedy regardless of actual value of the property on the date of sale].) Thus, the lender is not entitled to insurance proceeds payable for prepurchase damage to the property, prepurchase net rent proceeds, or damages for waste, because the lender's only interest in the property, the

repayment of its debt, has been satisfied, and any further payment would result in a double recovery. (See *Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at pp. 606-607.)

### 4. *Fraud Claims*

"The necessary elements of fraud are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108 [252 Cal.Rptr. 122, 762 P.2d 46]; see *Seeger* v. *Odell* (1941) 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]; § 1709.)[4] Only the last two elements are at issue in this case.

■ Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction. (*Spinks* v. *Clark* (1905) 147 Cal. 439, 444 [82 P. 45]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 711, p. 810.) "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." (*Blankenheim* v. *E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1475 [266 Cal.Rptr. 593]; *Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763] ["[w]hether reliance is justified is a question of fact for the determination of the trial court"]; *Guido* v. *Koopman* (1991) 1 Cal.App.4th 837, 843 [2 Cal.Rptr.2d 437] ["the reasonableness of the reliance is ordinarily a question of fact"].) "However, whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts." (*Guido* v. *Koopman, supra,* 1 Cal.App.4th at p. 843.)

"Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather

---

[4]Here, Alliance's fraud claims include allegations of intentional misrepresentation, negligent misrepresentation, and breach of fiduciary duty. (See §§ 1572, 1710; *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 407 [11 Cal.Rptr.2d 51, 834 P.2d 745], [negligent misrepresentation is a species of the tort of deceit]; *Salahutdin* v. *Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 563 [29 Cal.Rptr.2d 463] [breach of a fiduciary duty usually constitutes constructive fraud].) While we focus on Alliance's intentional misrepresentation claim, justifiable reliance and actual damages are also essential elements of negligent misrepresentation and constructive fraud. (*Home Budget Loans, Inc.* v. *Jacoby & Meyers Law Offices* (1989) 207 Cal.App.3d 1277, 1285 [255 Cal.Rptr. 483] [elements of negligent misrepresentation include justifiable reliance and resulting damage]; 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 666, p. 117; *id.,* § 680, p. 131; *id.,* § 681, p. 133.)

than negligent." (*Seeger* v. *Odell, supra*, 18 Cal.2d at p. 414.) "Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man." (*Id.* at p. 415.) "If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery." (*Ibid.; Gray* v. *Don Miller & Associates, Inc., supra*, 35 Cal.3d at p. 503 ["the issue is whether the person who claims reliance was justified in believing the representation in the light of his own knowledge and experience"].) " 'If the plaintiff and defendant are in a confidential relationship there is no duty of inquiry until the relationship is repudiated. The nature of the relationship is such as to cause the plaintiff to rely on the fiduciary, and awareness of facts which would ordinarily call for investigation does not excite suspicion under these special circumstances.' " (*Lee* v. *Escrow Consultants, Inc.* (1989) 210 Cal.App.3d 915, 921 [259 Cal.Rptr. 117].)

In addition, unless the plaintiff merely seeks to rescind the contract, it must suffer actual monetary loss to recover on a fraud claim. (*Molko* v. *Holy Spirit Assn., supra*, 46 Cal.3d at p. 1108; *Empire West* v. *Southern California Gas Co.* (1974) 12 Cal.3d 805, 810, fn. 2 [117 Cal.Rptr. 423, 528 P.2d 31] [fraud without damage furnishes no ground for action]; *Home Budget Loans, Inc.* v. *Jacoby & Meyers Law Offices, supra*, 207 Cal.App.3d at p. 1285.) There are two measures of damages for fraud: out of pocket and benefit of the bargain. (*Stout* v. *Turney* (1978) 22 Cal.3d 718, 725 [150 Cal.Rptr. 637, 586 P.2d 1228].) The "out-of-pocket" measure of damages "is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received. The 'benefit-of-the-bargain' measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive." (*Ibid.; Salahutdin* v. *Valley of California, Inc., supra*, 24 Cal.App.4th at p. 564; *Overgaard* v. *Johnson* (1977) 68 Cal.App.3d 821, 823 [137 Cal.Rptr. 412].) "In California, a defrauded party is ordinarily limited to recovering his 'out-of-pocket' loss . . . ." (*Kenly* v. *Ukegawa* (1993) 16 Cal.App.4th 49, 53 [19 Cal.Rptr.2d 771].)

In fraud cases involving the "purchase, sale or exchange of property," the Legislature has expressly provided that the "out-of-pocket" rather than the "benefit-of-the-bargain" measure of damages should apply. (§ 3343,

subds. (a), (b)(1).)[5] This section does not apply, however, when a victim is defrauded by its fiduciaries. In this situation, the "broader" measure of damages provided by sections 1709[6] and 3333[7] applies. (*Liodas* v. *Sahadi* (1977) 19 Cal.3d 278, 283-284 [137 Cal.Rptr. 635, 562 P.2d 316]; *Gray* v. *Don Miller & Associates, Inc., supra,* 35 Cal.3d at p. 504 [plaintiff's damages suffered because of fiduciary's misrepresentation measured under section 3333]; *Stout* v. *Turney, supra,* 22 Cal.3d at pp. 725-726 [A "clear exception" to section 3343 "has emerged in cases involving fraudulent *fiduciaries.*" (Italics in original.)]; *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 741 [336 P.2d 534] ["In the absence of a fiduciary relationship, recovery in a tort action for fraud is limited to the actual damages suffered by the plaintiff."]; *Salahutdin* v. *Valley of California, Inc., supra,* 24 Cal.App.4th at p. 565.)

■ Punitive damages are recoverable in those fraud actions involving intentional, but not negligent, misrepresentations. (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 790 [157 Cal.Rptr. 392, 598 P.2d 45]; *Branch* v. *HomeFed Bank* (1992) 6 Cal.App.4th 793, 799 [8 Cal.Rptr.2d 182] [no punitive damages recoverable for negligent misrepresentation]; § 3294.) The jury also has discretion to award prejudgment interest on the plaintiff's loss "from the time the plaintiff parted with the money or property on the basis of the defendant's fraud." (*Nordahl* v. *Dept. of Real Estate* (1975) 48 Cal.App.3d 657, 665 [121 Cal.Rptr. 794]; § 3288.) A plaintiff is not entitled, however, to attorney fees "as an element of damages in actions for fraud in which the defendant is a fiduciary." (*Gray* v. *Don Miller & Associates, Inc., supra,* 35 Cal.3d at p. 507.)

## B. *Cases Applying the Full Credit Bid Rule*

The issue we confront here is whether a lender's acquisition of security property by full credit bid at a nonjudicial foreclosure sale bars the lender from maintaining a *fraud* action to recover damages from third parties who fraudulently induced the lender to make the loans. *Cornelison* v. *Kornbluth,*

---

[5]Section 3343, subdivision (a), provides, "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including" certain enumerated damages such as lost profits. We have held that section 3343 does not require that a plaintiff show "out-of-pocket" loss in order to be entitled to consequential or additional damages of the type prescribed by the statute. (*Stout* v. *Turney, supra,* 22 Cal.3d at pp. 729-730.)

[6]Section 1709 provides: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

[7]Section 3333, the general tort damage measure provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

*supra*, 15 Cal.3d 590, was this court's first and last discussion of the effect of a full credit bid in a nonjudicial foreclosure sale. In *Cornelison*, the plaintiff sold a single-family dwelling, taking back a promissory note secured by a first deed of trust on the property. (*Id.* at p. 594.) The property was subsequently reconveyed, and ultimately condemned as unfit for human habitation. The original purchasers defaulted on the note, and plaintiff caused the property to be sold at a trustee's sale. (*Ibid.*) She purchased the property at the sale by making a full credit bid. (*Id.* at pp. 594, 606.)

Plaintiff then sued one of the subsequent purchasers in part for waste. (*Cornelison* v. *Kornbluth, supra*, 15 Cal.3d at p. 594.) "Waste" is a cause of action based on the recognition that "any person whose property is subject to a lien has a statutory duty to refrain from acts which will 'substantially impair the mortgagee's security.' " (Sheneman, Cal. Foreclosure: Law and Practice, *supra*, § 6.16, p. 6-70.) "Waste" includes acts of commission and omission, such as a failure to generally maintain and repair the property. (*Ibid.*; see *Cornelison* v. *Kornbluth, supra*, 15 Cal.3d at pp. 599, 603; § 2929.)

We first concluded that a lender's claim for bad faith waste was not precluded by the antideficiency statutes. (*Cornelison* v. *Kornbluth, supra*, 15 Cal.3d at p. 605.) However, we "further concluded that even assuming that defendant is liable on such basis, nevertheless plaintiff cannot recover since she purchased the subject property at the trustee's sale by making a full credit bid." (*Id.* at p. 606, fn. omitted.) We explained, "the measure of damages for waste is the amount of the impairment of the security, that is the amount by which the value of the security is less than the outstanding indebtedness and is thereby rendered inadequate." (*Ibid.*) "[T]he mortgagee's purchase of the property securing the debt by entering a full credit bid establishes the value of the security as being equal to the outstanding indebtedness and ipso facto the nonexistence of any impairment of the security." (*Ibid.*) We stated, "Where an indebtedness secured by a deed of trust covering real property has been satisfied by the trustee's sale of the property on foreclosure for the full amount of the underlying obligation owing to the beneficiary, the lien on the real property is extinguished." (*Ibid.*, citing Civ. Code, § 2910; *Streiff* v. *Darlington* (19[37]) 9 Cal.2d 42, 45 [68 P.2d 728]; *Duarte* v. *Lake Gregory Land and Water Co.* (1974) 39 Cal.App.3d 101, 104-105 [113 Cal.Rptr. 893].) "In such event, the creditor cannot subsequently recover insurance proceeds payable for damage to the property [citations], net rent proceeds [citations], or damages for waste [citations]." (*Cornelison* v. *Kornbluth, supra*, 15 Cal.3d at p. 606.) "If, however, [the lender] bids less than the full amount of the obligation and thereby acquires the property valued at less than the full amount, his security

has been impaired and he may recover damages for waste in an amount not exceeding the difference between the amount of his bid and the full amount of the outstanding indebtedness immediately prior to the foreclosure sale." (*Id.* at p. 607.)

In response to plaintiff's "complain[t] that it is difficult to calculate precisely the amount of damages recoverable for waste so as to determine the proper amount which the beneficiary or mortgagee should bid at the foreclosure sale," we stated: "Suffice it to say that no complicated calculations are necessary. The beneficiary or mortgagee need only enter a credit bid in an amount equal to what he assesses the fair market value of the property to be in its condition at the time of the foreclosure sale. If that amount is below the full amount of the outstanding indebtedness and he is successful in acquiring the property at the foreclosure sale, he may then recover any provable damages for waste." (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at p. 608.)

Since *Cornelison,* the Courts of Appeal have approached the effect of a full credit bid on a lender's fraud claim in various ways with irreconcilable results. Two Court of Appeal decisions directly address the issue at hand, and, as noted earlier, conflict with the Court of Appeal's opinion in this case. (*Western Fed. Savings & Loan Assn.* v. *Sawyer, supra,* 10 Cal.App.4th 1615; *GN Mortgage Corp.* v. *Fidelity Nat. Title Ins. Co., supra,* 21 Cal.App.4th 1802; see also *Evans* v. *California Trailer Court, Inc.* (1994) 28 Cal.App.4th 540, 556 [33 Cal.Rptr.2d 646], ["Both fraud and conversion claims are subject to the full credit bid rule . . . ."].)

In *Western Fed. Savings & Loan Assn.* v. *Sawyer, supra,* 10 Cal.App.4th 1615, defendant Sandra Sawyer, a lawyer involved in real estate transactions, opened an escrow to sell a parcel of residential property she owned to the Smiths. (*Id.* at p. 1617.) According to the escrow instructions and loan documents, the Smiths were to pay $115,000 for the property and make a cash downpayment of $23,000. The loan application indicated the Smiths intended to occupy the property. Sawyer represented, and a presale appraisal indicated, that the property was a duplex. (*Ibid.*)

The Smiths' loan application was referred to Western through a mortgage broker. The bank reviewed the presale appraisal and agreed to fund the loan request for $92,000. (*Western Fed. Savings & Loan Assn.* v. *Sawyer, supra,* 10 Cal.App.4th at p. 1617.)

The loan went into default, and Western purchased the property at a nonjudicial foreclosure sale after making a full credit bid. (*Western Fed.*

*Savings & Loan Assn.* v. *Sawyer, supra,* 10 Cal.App.4th at p. 1617.) Thereafter, the bank incurred additional expenses to maintain and renovate the residence in order to resell it on the open market. (*Id.* at p. 1618.) Following foreclosure, the bank discovered the property was not a bona fide duplex. By this time the bank was also aware that the Smiths never occupied the property, and may not have made the $23,000 cash downpayment required by the escrow and loan agreements. The bank eventually sold the property for $96,500. (*Ibid.*)

A jury found that Sawyer was part of a conspiracy to fraudulently induce the bank to make the loan to the Smiths. (*Western Fed. Savings & Loan Assn.* v. *Sawyer, supra,* 10 Cal.App.4th at p. 1618.) The Court of Appeal reversed, holding that the bank's full credit bid barred its causes of action for fraud and misrepresentation. (*Id.* at pp. 1618-1619, 1623.) Relying on *Cornelison,* the court concluded that the bank's acquisition of the security property with a full credit bid at a nonjudicial foreclosure sale extinguished the bank's lien on that property. Accordingly, the bank's security for the debt was not impaired, and the bank had suffered no damage; hence it had no viable cause of action for fraud or misrepresentation. (*Id.* at p. 1623.) Thus, *Western* impliedly concluded that the measure of damages for a fraudulent representation to a lender is the impairment of its security. The court distinguished cases such as *Guild Mortgage, supra,* where the plaintiff was required by federal regulations to repurchase the property, and "those cases allowing actions for rescission despite a full credit bid." (*Id.* at p. 1622, fn. 3.)

In *GN Mortgage Corp.* v. *Fidelity Nat. Title Ins. Co., supra,* 21 Cal.App.4th 1802, 1803, the Court of Appeal similarly held that a full credit bid at a nonjudicial foreclosure sale extinguished all claims of a lender against the third party participants in a tortious conspiracy to defraud the lender. In *GN Mortgage,* the lender was fraudulently induced into making a $449,600 loan for the fictitious purchase of property at an inflated price after receiving forged loan documents under the name of an individual who had not agreed to, and was unaware his name was being used in, the transaction. After default, the lender purchased the property by making a full credit bid at a nonjudicial foreclosure sale and, after selling the property at an approximately $200,000 loss, sued the various nonborrowers for fraud, conversion, negligence, and breach of contract. Summary judgment was entered on behalf of Fidelity, the escrow agent for the transaction, and American Equities Financial Corp. (*Id.* at p. 1804.)

On appeal, the plaintiff first contended that the full credit bid rule was inapplicable where claims are asserted not against the purchaser but against third parties. (*GN Mortgage Corp.* v. *Fidelity Nat. Title Ins. Co., supra,* 21

Cal.App.4th at p. 1803.) According to the plaintiff, "where the purchaser is not involved, the purposes of the antideficiency statute, and the full credit bid rule stemming from it, are not implicated." (*Id.* at p. 1805.) The Court of Appeal rejected this argument, concluding that the full credit bid rule applied to claims against third parties, and stating that the "rule is concerned with damages and proximate causation. It is independent of the antideficiency statute." (*Ibid.*)

Second, plaintiff contended that the full credit bid rule was inapplicable because, under the circumstances of the case, its damages were measured by the out-of-pocket rule, not the extent of the impairment of its security. (*GN Mortgage Corp.* v. *Fidelity Nat. Title Ins. Co., supra,* 21 Cal.App.4th at p. 1807.) The court described this argument as "sophistical." (*Ibid.*) It stated, "because a foreclosure sale is designed to establish the value of the property sold, plaintiff's full credit bid set the value of the property at an amount sufficient to satisfy the indebtedness and all accrued expenses. Therefore, defendants' tortious conduct did not cause any damage. Any losses suffered thereafter resulted either from a severe market downturn or from defendants' exercise of business judgment." (*Id.* at p. 1809.)

As noted above, the Court of Appeal here expressly disagreed with *Western Federal* and *GN Mortgage,* and held that a lender's full credit bid at a nonjudicial foreclosure sale did not bar its subsequent fraud claim against third parties who fraudulently induced the lender to make the loan. The court reasoned that a "full credit bid does not establish the value of the property for all purposes, but only for the purpose of foreclosure proceedings against a borrower," and hence had no application to claims against third party tortfeasors. It concluded that "[t]he central error of *Western Federal, supra,* and *GN Mortgage, supra,* is the failure to appreciate that because the full credit bid rule was conceived only to further the debtor protection purposes of the antideficiency statutes, it has no application in actions against parties not sued as debtors. The statement in *GN Mortgage* that the rule is simply 'concerned with damages and proximate causation' and 'is independent of the antideficiency statute' [citation] is wrong. It is inconceivable the Supreme Court anticipated the rule it announced in *Cornelison* would be used to insulate third party tortfeasors from liability for fraudulent conduct, as was done below."

The court also found that *Western Federal* and *GN Mortgage* erred in concluding that the measure of damages for fraud is the impairment of the security. Rather, the court concluded that damages for fraud by a fiduciary (which it concluded defendants were) are measured by sections 3333 and 1709, and in particular, the "benefit-of-the-bargain," not the "out-of-pocket," rule.

## C. *Effect of Alliance's Full Credit Bids on Fraud Claims*

We now consider whether Alliance's full credit bids as a matter of law bar its fraud claims against North American and Ticor. We conclude that they do not. Accepting as true the allegations of the complaint, as we must, defendants "joined with others in a conspiracy to perpetrate a deliberate fraud which could conceivably have caused injury even to a lender who had exercised reasonable care in the conduct of its business affairs." (*Guild Mortgage, supra,* 193 Cal.App.3d at p. 1515 (conc. opn. of Gates, J.).)

Defendants essentially argue that as a result of its full credit bids, Alliance could demonstrate neither justifiable reliance nor actual damages. We consider these arguments in turn.

As with any purchaser at a foreclosure sale, by making a successful full credit bid or bid in any amount, the lender is making a generally irrevocable offer to purchase the property for that amount. (§ 2924h, subd. (a).) The lender, perhaps more than a third party purchaser with fewer resources with which to gain insight into the property's value, generally bears the burden and risk of making an informed bid.

It does not follow, however, that being intentionally and materially misled by its own fiduciaries[8] or agents as to the value of the property prior to even making the loan is within the realm of that risk. (See *Brown* v. *Critchfield* (1980) 100 Cal.App.3d 858, 871 [161 Cal.Rptr. 342] [Risk inherent in secured land transactions is on the mortgagee, "but that risk should not be expanded to include the assumption of damages resulting from a fiduciary's negligence or fraud"].) Most lenders, such as Alliance in this case, are corporate entities, and rely on their agents to provide them material information. Here, Alliance did obtain appraisals, and attempted to make informed loan decisions. It alleges, however, that its appraiser, Rothwell, in conspiracy with defendants, fraudulently misrepresented the nature of the properties and the existence and qualifications of the buyers, and that it did not discover the fraud until after it acquired title to the properties. The full credit bid rule was not intended to immunize wrongdoers from the consequences of their fraudulent acts.

We conclude therefore that in order to establish reliance, Alliance need only demonstrate that its full credit bids were a proximate result of defendants' fraud, and that in the absence of such fraud it would not, in all

---

[8]As noted above, Alliance alleges that defendants were fiduciaries. We need not decide whether this contention is correct, or determine the precise relationship between the parties. Our holding is simply that to the extent defendants made fraudulent misrepresentations on which Alliance justifiably relied in making its full credit bid, they cannot assert the full credit bid rule as a defense to Alliance's fraud claims.

reasonable probability, have made the bids. (*Spinks* v. *Clark, supra*, 147 Cal. 439, 444; 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 711, p. 810.) As for the question of whether this reliance was justifiable, a generally fact-based inquiry, we reiterate that "Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent." (*Seeger* v. *Odell, supra*, 18 Cal.2d at p. 414.) "Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man." (*Id.* at p. 415.) "If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery." (*Ibid.; Gray* v. *Don Miller & Associates, Inc., supra*, 35 Cal.3d at p. 503 ["the issue is whether the person who claims reliance was justified in believing the representation in the light of his own knowledge and experience"].) " 'If the plaintiff and defendant are in a confidential relationship there is no duty of inquiry until the relationship is repudiated. The nature of the relationship is such as to cause the plaintiff to rely on the fiduciary, and awareness of facts which would ordinarily call for investigation does not excite suspicion under these special circumstances.' " (*Lee* v. *Escrow Consultants, Inc., supra*, 210 Cal.App.3d at p. 921.)

Thus, to the extent Alliance's full credit bids were proximately caused by defendants' fraudulent misrepresentations, and this reliance without independent or additional inquiry was either appropriate given the context of the relationship or was not otherwise manifestly unreasonable, Alliance's bids cannot be deemed an admission of the properties' value. (See *Bank of America etc. Assn.* v. *Reidy, supra*, 15 Cal.2d at p. 248 ["not unusual for a mortgagee to make a bid for the property in the amount owing on the debt" when it cannot recover a deficiency].) Hence, the full credit bid rule would not apply.

In the alternative, to the extent Alliance's full credit bids were not proximately caused by defendants' fraudulent misrepresentations, or its reliance without independent or additional inquiry was either inappropriate given the context of the relationship or was otherwise manifestly unreasonable, the full credit bid rule applies, and Alliance's bid would then constitute an irrevocable offer to purchase the property for that amount. (§ 2924h, subd. (a).) Hence, under these circumstances, Alliance would not be entitled to recover the difference between its bid, which by definition is "an amount equal to the unpaid principal and interest of the mortgage debt, together with the costs, fees and other expenses of the foreclosure," and the actual value of the property. (*Cornelison* v. *Kornbluth, supra*, 15 Cal.3d at p. 606, fn. 10.) It would, however, still be able to recover any other damages flowing from the

defendants' fraud. Because such a factual evaluation cannot be made on the pleadings alone, the trial court erred in entering judgment on the pleadings.[9]

We note that in its brief in this court, "Alliance does not claim that it was induced to make full credit bids, but rather that it was fraudulently induced to make loans." Obviously, as we have stated above, to the extent Alliance claims that its decision to acquire the properties was independent of defendants' misrepresentations, there is no causal connection between the defendants' fraudulent misrepresentations and Alliance's damages resulting from the full credit bids. (See *Mirkin* v. *Wasserman* (1993) 5 Cal.4th 1082, 1092 [23 Cal.Rptr.2d 101, 858 P.2d 568]; *Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 60 [248 Cal.Rptr. 217].) It appears, however, that Alliance sought to establish such a connection in the trial court by seeking to introduce evidence that "It is the custom and practice in the [lending] industry to make full credit bids without knowledge of the property's actual value, because only *after* the mortgagor obtains title and access to the property does it obtain the means to value the property."[10] Moreover, at oral argument Alliance clarified that it simply meant by this statement that there were no additional or subsequent statements by defendants on which it was relying, not that there was no causal connection between the misrepresentations and the full credit bids. We therefore are reluctant to deny Alliance the opportunity to present such evidence based on this single representation.

Alliance also alleges that for three of the properties it was compelled by FHLMC regulations to repurchase loans it had earlier sold to secondary investors before it learned of the fraud. Again, to the extent Alliance justifiably relied on defendants' misrepresentations in selling the loans, its damages resulting from any compelled repurchase were incurred as a direct

---

[9]We have required that a plaintiff's reliance on a defendant's fraudulent misrepresentations not be "manifestly unreasonable" for over 50 years. (*Seeger* v. *Odell, supra,* 18 Cal.2d at p. 415.) The concurring opinion cites no persuasive reason why we should create an exception from this rule of law for those plaintiffs who make full credit bids. (See conc. opn., *post,* at p. 1252.)

[10]Defendants argue that because Alliance had a contractual right to inspect the property, it should have "underbid" if it had any reason to believe that the security was inadequate to cover the secured obligation. While we need not reach this issue, we note that enforcement of a contractual right to inspect typically requires a cooperative borrower. "If a borrower refuses to allow a lender entry onto the property under an inspection provision . . . , a lender probably would not seek judicial enforcement of its inspection and entry rights (unless combined with a judicial foreclosure action) for fear that the proceeding would be construed as an 'action' for purposes of [Code of Civil Procedure section] 726." (Ferguson et al., *Assembly Bill 1735: New Rights for Lenders Holding Contaminated Real Property Security* (Cont.Ed.Bar 1992) 15 Real Prop. L. Rep. 1, 6; see § 2929.5, subd. (d) [expressly providing that a court order authorizing a lender to enter and inspect secured property for hazardous substances "shall not constitute an action within the meaning of" Code of Civil Procedure § 726, subdivision (a)].)

consequence of the fraud. (See *Guild Mortgage, supra,* 193 Cal.App.3d at pp. 1508-1509; *id.* at p. 1514 [Allegations that federal regulations compelled repurchase of properties resulting in plaintiff's damage, repurchase necessitated by fraud, and loan would not have been made in the absence of purported misrepresentations "sufficient to establish a clear causal connection between defendants' alleged fraudulent conduct and the damages sustained."].) Accordingly, for these claims in particular, we perceive no basis on which such a repurchase, or any full credit bid by the FNMA, would even arguably preclude Alliance from pursuing a fraud claim against defendants.

■ We next consider defendants' argument that Alliance has failed to allege actual damages. This argument is dependent on defendants' assumption that the measure of damages for fraudulent inducement of a loan is the impairment of the lender's security or the balance of the outstanding indebtedness. Not so. Alliance does not allege here that defendants impaired its security or caused the value of the properties to decrease *after* the loans were made. Rather, it alleges that defendants' intentional misrepresentations regarding the properties' characteristics and values induced it to make loans that far exceeded the properties' actual worth *at the time the loans were made,* and that as a result of these misrepresentations Alliance purchased the properties. In other words, defendants did not damage or impair Alliance's security interest; rather they deceived Alliance at the outset as to what that security was. This is a wholly different claim from that which we considered in *Cornelison.* Once again, just as a suit for fraud against a borrower "is a completely separate remedy than a suit on the promissory note secured by the deed of trust," and hence not barred by the antideficiency statutes (*Manson* v. *Reed, supra,* 186 Cal.App.3d at page 1501), a lender's suit against its fiduciaries or agents for fraudulently inducing it to make loans and purchase property is a completely separate cause of action from a suit for impairment of its security.

The damages for such fraud are measured not by the outstanding indebtedness, but by either Alliance's out-of-pocket and consequential damages under section 3343 or under section 3333, depending on whether defendants stand in a fiduciary relationship to Alliance. The Court of Appeal here, relying on its earlier opinion in *Salahutdin* v. *Valley of California, Inc., supra,* 24 Cal.App.4th at pages 564-568, concluded that the appropriate measure of damages for fraud by a fiduciary under section 3333 was the benefit-of-the-bargain rule. *Salahutdin,* however, involved the measure of damages for a fiduciary's *negligent* misrepresentation. (*Salahutdin* v. *Valley of California, Inc., supra,* 24 Cal.App.4th at p. 560.) We have previously held that a plaintiff is only entitled to its actual or "out-of-pocket" losses suffered because of fiduciary's negligent misrepresentation under section

3333. (*Gray* v. *Don Miller & Associates, Inc., supra,* 35 Cal.3d at pp. 502, 504, citing *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 490 [275 P.2d 15].) While the measure of damages under section 3333 might be greater for a fiduciary's *intentional* misrepresentation, we need not address that issue here. (See *Salahutdin* v. *Valley of California, Inc., supra,* 24 Cal.App.4th at pp. 565-566 [discussing commentators' suggestion that a benefit-of-the-bargain measure of damages is appropriate when the fiduciary's misrepresentation is intentional, and an out-of-pocket measure of damages is applicable when the misrepresentation is negligent]; Cal. Attorney's Damages Guide (Cont.Ed.Bar Supp. May 1995) § 2.33A, pp. 85-86.) The question before us is whether Alliance stated a fraud claim that survives a motion for judgment on the pleadings. Alliance alleges at least out-of-pocket damages when it alleges that it paid more for the properties than they were worth, and incurred certain consequential damages. (See *Gagne* v. *Bertran, supra,* 43 Cal.2d at p. 490, fn. 6.) Accordingly, its full credit bids do not establish as a matter of law that it sustained no actual damages.

Defendants' remaining arguments are unpersuasive. Ticor attempts to distinguish *Brown* v. *Critchfield, supra,* 100 Cal.App.3d at page 873, which allowed the plaintiff to recover certain damages for breach of fiduciary duty despite the plaintiff's full credit bid, by asserting the damages in that case were not premised on any decrease in the value of the remaining security, whereas Alliance only suffered impairment of security damages here. As we have explained, however, Alliance alleges that the securities in this case have never been worth the value represented to it by defendants. Thus, Alliance does not allege, and does not seek damages for, the impairment of that security caused by events which decreased the value of the property after it made the loans.

Citing *BFP* v. *Resolution Trust Corp., supra,* 511 U.S. __ [128 L.Ed.2d 556, 114 S.Ct. 1757], North American argues that "courts should not go behind the creditor's successful bid at a foreclosure sale to impeach the value established by that bid." However, the issue in *BFP* was whether "the consideration received from a noncollusive, real estate mortgage foreclosure sale conducted in conformance with applicable state law conclusively satisfies the Bankruptcy Code's requirement that transfers of property by insolvent debtors within one year prior to the filing of a bankruptcy petition be in exchange for 'a reasonably equivalent value.' " (*Id.* at p. __ [128 L.Ed.2d at p. 561, 114 S.Ct. at p. 1759].) The court concluded that "a 'reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." (*Id.* at p. __ [128 L.Ed.2d 569, 114 S.Ct. at p. 1765].) Nothing in this conclusion negates the well-established fraud

exception in California to the finality of a foreclosure, or indeed any, property sale. (See *Bank of America etc. Assn.* v. *Reidy, supra*, 15 Cal.2d at p. 248 ["It is the general rule that courts have power to vacate a foreclosure sale where . . . the sale . . . is tainted by fraud . . . ."].)

## CONCLUSION

 We conclude that Alliance's full credit bids do not as a matter of law bar its fraud claims against defendants. Accordingly, the entry of judgment on the pleadings was improper. (Cf. *Molko* v. *Holy Spirit Assn., supra*, 46 Cal.3d at p. 1110 [court need not resolve factual dispute other than to recognize it precludes summary judgment].) The judgment of the Court of Appeal is affirmed, with directions to remand the matter to the trial court for further proceedings in accordance with this opinion.[11]

Mosk, J., Kennard, J., Baxter, J., and George, J., concurred.

**WERDEGAR, J.**—I concur in the judgment. Judgment on the pleadings was improperly granted, because Alliance's full credit bids do not preclude it from seeking damages from nonborrower third parties for fraudulently inducing Alliance to lend money to others. I write separately to discuss what I believe to be an unwarranted limitation, in the majority opinion, on the damages Alliance may recover if its bids were not made in justifiable reliance on defendant's misrepresentations. In my view, Alliance can establish a cause of action for fraud by showing it justifiably relied on defendants' misrepresentations *in making the loans*, regardless of whether it was also justified in later making full credit bids for the security properties. In such an action it may recover, at least, the amounts it is actually out of pocket as a result of making the loans.

In pleading its cause of action for intentional misrepresentation, Alliance alleged it "made the loans applied for" in justifiable reliance on, and as a proximate result of, defendants' false representations. Alliance alleged several categories of damage suffered as a consequence of having made the loans: the receipt of security interests worth far less than the represented value; the failure of the borrowers, whose qualifications were misrepresented, to repay the loans; consequential costs and expenses of foreclosing on and reselling the security properties; and punitive damages attributable to defendants' fraudulent, willful and malicious conduct in inducing the loans. Accepting as true the allegations of the complaint, Alliance suffered cognizable injury *when it was fraudulently induced to make the loans*. It put out

---

[11]North American's motion for judicial notice of 649 trustee's deeds recorded in December 1994 is hereby denied. (*Mangini* v. *R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063-1065 [31 Cal.Rptr.2d 358, 875 P.2d 73].)

considerable sums, which it has not fully recovered either through repayment or foreclosure. Even if limited to the "out-of-pocket" measure of damages under Civil Code section 3343, subdivision (a) (see maj. opn., *ante*, at pp. 1239-1241), Alliance suffered compensable damages as a result of loans induced by defendants' fraudulent misrepresentations. It is also, therefore, potentially entitled to punitive damages for defendants' intentional misrepresentations. (Civ. Code, § 3294, subd. (b)(3).)

Alliance, of course, did repurchase the properties with full credit bids. This decision, if shown to be unreasonable, may affect the extent of Alliance's recoverable damages. Like any injured party, Alliance may not recover damages caused by its own unreasonable behavior rather than by the defendants' tortious acts. Stated another way, Alliance was obligated to take reasonable care to mitigate its damages. (See *Valencia* v. *Shell Oil Co.* (1944) 23 Cal.2d 840, 846-847 [147 P.2d 558] ["The essence of the rule denying recovery for losses which could have been prevented by the reasonable efforts and expenditures of plaintiff is that his conduct rather than that of defendants proximately caused such losses."].) If the proof at trial shows that Alliance acted unreasonably in purchasing the security properties by full credit bid without reinspecting or reappraising them, *and that its unreasonable failure to take such protective measures enhanced its damages*, Alliance should not recover any such *increased* damages.

The majority goes beyond this undisputed principle to hold Alliance may not recover its full out-of-pocket damages if its decision to make full credit bids was manifestly unreasonable, *regardless of whether making such bids actually increased Alliance's damages*. (Maj. opn., *ante*, at pp. 1247-1248.) It is this portion of the majority opinion with which I disagree.

A simple hypothetical illustrates the difference between the majority's position and my own. Suppose nonborrower defendant fraudulently induces plaintiff to lend $400,000, on security falsely represented to be worth at least that amount but actually worth only $250,000, to a nonexistent or otherwise unqualified borrower. The borrower defaults without repaying any of the loan. Without conducting further inspections or appraisals, and without discovering the fraud, plaintiff purchases the security property at the trustee's sale with a full credit bid for the outstanding debt, $400,000 (ignoring, for simplicity's sake, outstanding interest and the costs of foreclosure). Shortly thereafter plaintiff resells the property for a fair market price of $250,000.

In plaintiff's action against the defrauding third party, the trier of fact determines plaintiff justifiably relied on defendant's misrepresentations in

making the loan, but that it was manifestly unreasonable of plaintiff to make a full credit bid at the trustee's sale without reinspecting or reappraising the property. I believe plaintiff, under these circumstances, would be entitled to recover at least its out-of-pocket losses: the amount loaned ($400,000) minus the amount recovered from resale of the property ($250,000), or $150,000. While plaintiff, by hypothesis, acted unreasonably in making a full credit bid, *it did not thereby increase its damages.* That is, even if plaintiff had acquired the property for a credit bid of less than $400,000, it could not have resold the property for more than the fair market price of $250,000, and its out-of-pocket damages would still have been $150,000. Since the amount of the credit bid did not affect the amount of plaintiff's out-of-pocket losses, plaintiff's recoverable damages should not be reduced even if its bid was an unreasonable one.

Under the majority's holding, however, plaintiff, by making the bid, would be barred from claiming the property was worth less than $400,000. Under this rule plaintiff would have no recoverable out-of pocket damages, since it expended $400,000 in loan funds and acquired a property deemed to be worth $400,000. Plaintiff could not, the majority explains, "recover the difference between its bid . . . and the actual value of the property." (Maj. opn., *ante,* at p. 1247.) Since that increment—the difference between plaintiff's $400,000 bid and the $250,000 value of the property—is all of plaintiff's hypothetical out-of-pocket losses, plaintiff's recovery would be zero. This result would obtain even though plaintiff would have suffered the same losses had it underbid; recovery would be denied, that is, even though all of plaintiff's damages were proximately caused by the fraud.[1]

There may be circumstances in which entry of a full credit bid *does* increase the plaintiff's losses. Even in such a case, however, I believe the majority misstates the extent of allowable recovery. Consider a variation of the above hypothetical. Suppose the evidence at trial establishes that on the date of the trustee's sale the fair market value of the property was $300,000 and that the trustee could have sold it for that price had plaintiff not entered a full credit bid of $400,000. Suppose further that, because of market changes after the trustee's sale, plaintiff is able to resell the property for only $250,000.

Plaintiff, as in the original hypothetical, is out of pocket $150,000, but under these circumstances only $100,000 of the loss would have been

---

[1]The majority's emphasis on the bids as limiting damages may result from a misapprehension as to the nature of Alliance's claim for damages. Alliance's claim is not that it was injured when it "paid more for the properties than they were worth" (maj. opn., *ante,* at p. 1250), but that it was injured when it *loaned money* to unqualified borrowers on inadequate security.

proximately caused by reliance on defendant's fraud. Had plaintiff not unreasonably preempted the bidding, the trustee could have sold the property for $300,000, and plaintiff's losses would have been only $100,000. Plaintiff's recovery would therefore be limited to $100,000, the additional $50,000 being the proximate result of plaintiff's own manifestly unreasonable action.

Under the majority's rule, however, plaintiff would, as in the original hypothetical, recover no out-of-pocket damages, since it expended $400,000 in loan funds and received a property deemed, by virtue of its bid, to be worth $400,000. Thus the majority would deny plaintiff recovery of even the $100,000 that was proximately caused by its reliance, *in making the loan*, on defendant's fraudulent misrepresentations.

I agree with the majority that the full credit bid rule, properly understood, precludes the lender, "*for purposes of collecting its debt*, from later claiming the property was actually worth less than the bid." (Maj. opn., *ante*, at p. 1238, italics added.) I also agree the full credit bid rule was not intended, and should not be applied, "to immunize wrongdoers from the consequences of their fraudulent acts." (*Id.* at p. 1246.) Here, however, Alliance's action for fraud against these nonborrower third parties is *not* an attempt to collect its debt, and application of the full credit bid rule in fact *would* protect defendants from the consequences of their allegedly fraudulent acts. I would therefore hold the rule, properly understood, simply does not apply. To the extent Alliance acted unreasonably and to its own detriment in bidding as it did, it will be precluded from recovering any damages attributable to its actions under the ordinary rule barring recovery of losses not proximately caused by the fraud.

Lucas, C. J., concurred.