[Civ. No. 7865. Third Dist. July 12, 1951.]

ALBERT GUTTINGER et al., Appellants, v. CALAVERAS CEMENT COMPANY (a Corporation), Respondent.

Mazzera, Snyder & DeMartini for Appellants.

Huberty & Huberty for Respondent.

VAN DYKE, J.—This was an action brought to enjoin a nuisance. Originally there were six plaintiffs. Judgment was given in favor of all of them for injunctive relief and in favor of five of them for damages. Four of the plaintiffs have appealed. They are Albert Guttinger, Louis B. Joses, Frank and Colombo Oneto. The defendant for long has operated in the vicinity of plaintiffs' lands a plant for the production of cement. During 1946 and 1947 the capacity of the plant was extended by the addition of a third kiln to the two already operating. Through this means and the increased use of the existing kilns the production of the plant was greatly increased. In 1945, 1,188,000 pounds of cement were produced and in 1948, 1,825,000 pounds were produced. In 1937 a two unit Cottrell precipitator was installed to reduce the amount of dust and gases being discharged into the surrounding atmosphere from the stack. Prior to the trial the defendant started to install an additional precipitator unit and it was testified that it would be in operation shortly after the close of the trial. During the period of increased activity in cement production and up to the time of trial dust and gases escaping from the stack were carried over and deposited upon portions of each plaintiff's land and the testimony was sufficient to sustain findings of the jury that damage was caused and to sustain the determination by the court that the method of operation constituted a nuisance. The jury awarded damages to appellant Guttinger in the sum of $3,439.75, to appellant Joses in the sum of $660, and to appellants Frank and Colombo Oneto in the sum of $2,298.80. The trial court rendered judgments in those sums and also granted injunctive relief. It commanded the defendant to desist and refrain, after June 30, 1949, from permitting stack dust or raw mix in powdered form to be discharged from its stack ''in excess of thirteen

per cent (13%) of all flue dust and/or raw mix in powdered form which would, or could, be emitted or discharged from defendant's said kilns, or any thereof, in the absence of any dust collecting or precipitating device." It further ordered that in determining the quantity of discharge "the method used shall be that described in Bulletin WP 50 entitled 'Methods for Determination of Velocity, Volume, Dust and Mist Content of Gases,' published by Western Precipitation Corporation, or other equally reliable, accurate and approved method of determination." The court further ordered that the defendant keep in continuous operation all three units of the precipitator during the operation of any two or more of the kilns and not less than two units of the precipitator during the operation of not more than one of the kilns; that defendant keep each precipitator unit in good operating condition in order to provide "within reasonable limits, maximum operating efficiency, and with a dust recovery efficiency of not less than eighty-seven per cent (87%) at all times." The court allowed a reasonable time, not exceeding a total of 10 days in any calendar year, for upkeep and repair purposes, during which intervals the defendant was not to be subject to the restraints imposed.

Appellants, dissatisfied with the damages awarded and the restraints imposed, contend: 1. That the court committed prejudicial error in instructing the jury upon the measure of damages, and, 2. That the court did not grant a workable or sufficiently restrictive injunction.

It was shown that each of the plaintiffs was and for long had been engaged in cattle raising and particularly in the production of calves for market, and that in this business they used the injured lands for grazing purposes, which purposes, from the evidence, appears to be the highest and best use for which these lands are adapted.

The action was filed in March of 1948, and recovery of damages was sought from a date three years anterior thereto up to the time of trial. Plaintiffs claimed damages as follows: For interference with the use of the affected lands for grazing purposes; for permanent damage thereto; for damage to the improvements thereon; for cost of rehabilitation by burning over the property; for injury to the cattle through consumption of the deposited material along with the herbage, and for discomfort and annoyance in their personal use of their property. During the course of the trial, appellants withdrew

all claims for permanent damage to the land. The question of the amount of damages suffered through damage to improvements, for rehabilitation, for direct injury to cattle, and for discomfort and annoyance were submitted to the jury upon instructions as to which no objections are here made. But the parties were in disagreement throughout the trial as to the proper measure of damages suffered by loss or diminution of use of the property for grazing purposes. The court gave the basic instruction contained in section 3333 of the Civil Code, that for the breach of an obligation not arising from contract the measure of damages is the amount which will compensate for all the detriment proximately caused thereby whether it could have been anticipated or not, and neither party objects thereto. But more specifically, the court instructed the jury with respect to the measure of plaintiffs' damages from loss of pasturage as follows:

"The elements entering into this damage are the following:

"(1) The extent to which the plaintiffs' use of their respective ranches for grazing purposes has been interfered with or denied, if at all, since March 15, 1945. To prove this element of their damage, plaintiffs have offered evidence tending to show the reasonable value of their loss of income from the cattle business carried on by them on these ranches during the period involved. On the other hand, the defendant has offered opposing evidence tending to show the difference in the fair rental values of the ranches affected, with and without the injury, if any, caused by the defendant. Both of these methods of measuring damages are approved by the law, and both or either may be considered by you, in the event you undertake to fix the amount of damages. Should you adopt the 'loss of income' method, I instruct you that loss of income, or, in other words, loss of net profit, can be ascertained only by a full calculation of all the costs of production, properly chargeable to the business of raising cattle. Should you adopt the 'fair rental value' method, I instruct you that fair rental value in the amount, in terms of money, that the property would rent for if put upon the open market and rented in the manner in which property is ordinarily rented, for cash, in the community where it is situated, with a reasonable time being given to find a tenant or renter, and to make the rental arrangement, and having in mind all the purposes to which the property is adapted."

Pursuant to their theory that the plaintiffs were conducting long-established businesses in part upon the property damaged

and were entitled to recover loss of profits from their businesses caused by diminution of the productivity of their lands, the plaintiffs asked the court to instruct the jury that they should award ''The reasonable value of the loss of income from any real property belonging to the plaintiffs, or any of them, affected by such cement dust, smoke and/or chemicals, if any, during the period of time that said nuisance has been maintained not to exceed three years prior to March 15th, 1948.'' Throughout, the defendant contended, and here contends, that the proper measure of damages was the loss of rental value.

We think no hard and fast rule can be laid down in cases such as this. The code section cited rather describes the desired result, just compensation for injuries suffered, than a method of reaching that result and generally it will be proper, if not necessary, in the trial of an action of this sort for the court to give to the jury some more workable method for measuring damages than the broad language of the code section. There was no permanent injury to the real property here. Had there been, then, according to the majority of decisions on the subject, the damage would have been measured by the depreciation in the market value of the property injured. (39 Am.Jur. 396.) But the damage here was shown to be temporary in character and in such cases the general rule is that the measure of damages is the difference in the rental or usable value of the premises before and after the injury. (39 Am.Jur. 397.)

 Appellants, through their evidence, approached this matter of damages from the standpoint of an interference with an established business, that of cattle raising, and it is well settled in this state that where an established business has been injured or interfered with any loss of profits thus caused may be recovered. (*California Orange Co.* v. *Riverside Portland Cement Co.*, 50 Cal.App. 522 [195 P. 694] ; *Natural Soda Products Co.* v. *City of Los Angeles*, 23 Cal.2d 193, 199 [143 P.2d 12].) In the case last cited the court said:

''In addition to other items, plaintiff was awarded damages for loss of profits, which defendant contends was not proved with certainty. The award of damages for loss of profits depends upon whether there is a satisfactory basis for estimating what the probable earnings would have been had there been no tort. If no such basis exists, as in cases where the establishment of a business is prevented, it may be necessary to deny such recovery. [Citing cases.] If, however,

there has been operating experience sufficient to permit a reasonable estimate of probable *income* and *expense,* damages for loss of prospective profits are awarded. [Citing cases.] In the present case plaintiff's probable gross receipts could be estimated from its sales in the preceding two years, in view of the evidence that prices were stable. Its unit costs could be estimated on the basis of detailed figures concerning actual expenses, such as labor, depreciation, insurance, taxes, and royalties for the limited operations carried on in 1938. Its plant capacity was conservatively estimated at 90 tons per day, since plaintiff's old plant, using the 'carbonating process' had a proved capacity of from 35 to 40 tons a day, and the capacity of the new 'Mono Process' plant had been increased from 50 to 100 tons a day. Awards of prospective profits have been sustained on the basis of much less satisfactory evidence. [Citing cases.] Since defendant made it impossible for plaintiff to realize any profits, it cannot complain if the probable profits are of necessity estimated.'' (Italics added.)

The proof is clear that appellants herein have for long been engaged in an established business. The case, therefore, was one which would warrant recovery of damages measured by loss of profits. ▮ But when we speak of loss of profits caused by injury to an established business we are speaking of the business as an operating unit. It appears without conflict that each of the appellants operated a cattle business upon land areas owned or rented by them greatly exceeding in total the acreage affected by defendant's tort. Therefore it would not necessarily follow that because through that tort they had been deprived of the full pasturage use of a portion of the area used in conducting their business that they would have suffered any loss of gross income. They may have been put to greater cost to produce that gross income, in which event they would have been damaged by the amount of that greater cost. Notwithstanding the diminished pasturage value of the affected lands, their gross production of cattle for market may have been equally great and none of the appellants proved anything to the contrary. What they proved was that upon the affected areas they were able before the same were injured to pasture for portions of the year a certain number of range cows and that these cows so partially maintained upon the affected lands would have produced a certain number of calves which would have become available for the market, but they did not prove that this loss of gross

income actually occurred. ■ To allow loss of profits from injury to an established business there must not only have been "operating experience sufficient to permit a reasonable estimate of probable income and expense," but evidence must be introduced which proves the probable income and expense and this showing must be made in respect of the business as a whole. Such a showing the appellants did not make. ■ If the proof be insufficient to enable the jury to arrive at a conclusion based upon loss of profits, then the general rule of damages would have to be applied which, as we have stated, is the difference in the rental or usable value of the land before and after injury. ■ Aside from this, it must be said further that the trial court, when it modified the requested instruction upon loss of profits, committed no error. The appellants had asked the court to instruct the jury that in measuring the damages caused by injury to the use value of the land they should find "the reasonable value of the loss of income from any real property belonging to the plaintiffs" affected by the cement dust and to this the court added the qualification that in using that measure of damage they must ascertain all of the cost of production properly chargeable to the business of cattle raising. The court might have added that they were also to ascertain the fairly estimated gross income of the business before and after injury and subtract therefrom the costs as so ascertained, but the qualification which the court did add to the instruction was correct so far as it went and the court probably considered that further instruction upon how to arrive at profit was not necessary.

■ From what we have said it is clear, first, that the evidence did not contain sufficient data from which the jury could apply the loss of profit measure of damages. But appellants cannot complain that the court informed the jury that it might use such a measure since it was requested to do so by the appellants themselves. The proper measure to have been used under the record here was that of loss of rental value and the jury were instructed that such a measure was usable and were given amplifying instructions as to the matters to be considered in the use of it.

■ Appellants complain further that rules of damage are matters of law and that the court erred in telling the jury that it could use either of the two rules—loss of profit to an established business or loss of rental value—and further telling them that they might use both. We are unable to see how the jury could use both as each rule, if used, affords complete

compensation and leaves no room for the operation of another measure of damages. But to say that the court should not have told the jury that they might use both rules is not to say that prejudicial error was committed in the instant case. Appellants have been at pains to point out that "from the size of the verdicts it is quite apparent that the jury based their award of damages upon diminution of rental value rather than the loss of calf crop or loss of net income from the businesses" and we think that such is, in truth, apparent from the record. However, if that be true, then we may safely assume, since the diminution of rental value was the true measure here which ought to have been applied, that no damage has been caused by the alternative form of instruction which the trial court gave.

Appellants next contend that the injunctive decree was erroneous and did not afford to the successful plaintiffs who had proved the maintenance of the nuisance alleged the just relief to which they were entitled. We have hereinbefore quoted the essential provisions of that decree. The appellants as plaintiffs asked that the respondent be permanently enjoined from causing any dust, smoke or chemicals to be deposited upon their lands. This extreme restraint was not imposed by the trial court. On the contrary and upon substantial evidence the trial court determined that some dust, smoke and chemical gases could be discharged from the respondent's stacks without injury to appellants and we do not understand appellants to contend that this determination was not correct. Having so determined, the trial court was thereby of necessity required to formulate a practical decree which would restrain respondent from maintaining a nuisance and yet permit the operation of its plant with as little interference as was reasonably practicable. This we think the trial court clearly attempted to do and succeeded in doing.

"An abatement of a nuisance is accomplished in a court of equity by means of an injunction proper and suitable to the facts of each case. . . .

". . . A decree enjoining a nuisance should specifically point out the things which the defendant is required to do and to refrain from doing in order to abate the nuisance which is found to exist. It should be as definite, clear, and precise in its terms as possible, so that there may be no reason or excuse for misunderstanding or disobeying it, and, when practicable, it should plainly indicate to the defendant all the acts which he is restrained from doing, without calling upon

him for inferences or conclusions about which persons may well differ.'' (39 Am.Jur. § 171, pp. 442-443.)

For example, in *Carter* v. *Chotiner,* 210 Cal. 288 [291 P. 577], in an action brought to restrain the use of certain property for cemetery purposes upon the ground that such use would be a nuisance, the court enjoined the respondents interring any bodies within a strip 40 feet wide from the boundaries of the cemetery property, which form of restraint was upheld on appeal. In *Gelfand* v. *O'Haver,* 33 Cal.2d 218, 222 [200 P.2d 790], the court said:

"There can be no doubt that an injunction must not be uncertain or ambiguous and defendant must be able to determine from it what he may and may not do."

It was proper, therefore, for the trial court to endeavor from the evidence before it to formulate a decree which would be workable and which would abate the nuisance shown to exist. The court's decree is formulated upon the proposition that the escape of 13 per cent of the dust which would, without any regulatory device, be emitted from respondent's stack would not be injurious and that therefore if the dust's emission were held to that percentage of the total the just complaints of appellants would be met and satisfied. As we have said, there was evidence to support such a finding. For instance, there was evidence that the dust was objectionable when the cement plant first went into operation and remained that way until in 1938 when a precipitator was put on, whereupon the condition cleared up and did not become bad again until 1945. There was evidence also that within a few weeks after the conclusion of the trial an additional precipitator would go into operation and reduce the escape of dust to noninjurious quantities. There was evidence further that no damage had been done to soil by the dust that had been spread and that damage to grass was relatively slight; that the loss of pasturage on the affected area was due in part to other causes than dust from respondent's plant. It is not necessary to labor the point further. The trial court, while finding that a nuisance was being maintained, also found impliedly that the restriction imposed by the decree would eliminate the nuisance and that was all to which the appellants were then entitled. If further increase of cement production shall lead to a greater total volume of dust and gases, so that 13 per cent thereof would be injurious, the court will be open to entertain a motion to extend the restrictions and adapt them to the new conditions. We do not understand the court's decree

to adjudge that respondent has something in the nature of an easement for the deposit upon the appellants' lands of 13 per cent of the total amount of dust and gases generated in the conduct of its business, but rather that the court has taken the situation as it found it and undertook to impose workable restrictions that would eliminate the injury for the present. There is nothing in the record that would require any change in that decree in the present or in the near future. The court of course retains jurisdiction over the cause to modify its decree from time to time to fit changing conditions.

The judgment and the order appealed from are affirmed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied August 11, 1951; and appellants' petition for a hearing by the Supreme Court was denied September 7, 1951. Carter, J., voted for a hearing.