CITY SOLUTIONS, INC., Plaintiff,

v.

CLEAR CHANNEL COMMUNICATIONS, INC., Eller Media Co., and Adshel Inc., Defendants.

No. C99–00060 WHA.

United States District Court, N.D. California.

Jan. 24, 2003.

Nelson E. Brestoff, Joel S. Moskowitz, Moskowitz Brestoff Winston & Blinderman, Los Angeles, CA, for Plaintiff.

Michael B. Green, Brobeck Phleger & Harrison LLP, San Francisco, CA, Richard S. Odom, Brobeck Phleger & Harrison, Los Angeles, CA, Brett M. Schuman, Brobeck Phleger & Harrison LLP, San Francisco, CA, Scott R. Campbell, Daniel S. Mason, Zelle Hofmann Voelbel Mason & Gette LLP, San Francisco, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AND DENYING MOTION FOR NEW TRIAL

ALSUP, District Judge.

### INTRODUCTION

This case illustrates an important distinction under California fraud law: the difference between lost-profit damages and benefit-of-the-bargain damages. The jury found defendant Eller Media Company liable for $9,800,000. It now moves for judgment as a matter of law or for a new trial. As to the fraud verdict of nine million dollars, this order concludes that relief is required under FRCP 50. Judgment must be for Eller on plaintiff's fraud claim. As to the unfair-competition verdict, defendant's similar motion is **DENIED**. Defendant's motion for a new trial is **DENIED**.

### PROCEDURAL HISTORY

As this order on post-trial motions will be the last ruling by the district court before appeal, the following procedural summary may assist the court of appeals. This lawsuit arises out of plaintiff's failed attempt to win a public-works competition in San Francisco. In essence, the action blames the prevailing bidder for mislead-

ing plaintiff in connection with prospective bids.

On March 12, 1998, the City and County of San Francisco issued a request for proposals ("RFP") for a "Comprehensive Pedestal–Mounted News Rack Program for the City and County of San Francisco." As part of its plan to eliminate newsrack blight, San Francisco sought to outlaw conventional newsracks and to substitute up to 1,000 new multi-publication, modular newsracks. The RFP sought a contractor to furnish, install and maintain the newsracks in return for the vendor receiving the right to sell advertising on the backs of a portion of the newsracks and/or through free-standing advertisements.

City Solutions, Inc., is a company that designs, constructs, installs and operates modular newsracks. Eller Media Company (now known as Clear Channel Outdoor, Inc.) is a leading outdoor-advertisement firm. Adshel, Inc., is a company that builds and operates bus shelters which, like modular newsracks, are another type of "street furniture." Clear Channel Communications, Inc., was the parent company of Eller Media Company at all material times and acquired Adshel shortly before the bids were due, a timing circumstance important to the fact pattern in this case.

During the spring of 1998, pursuant to a written confidentiality agreement, CSI and Eller executives held several meetings concerning a possible joint bid. The parties disagree as to what promises or representations were made at these meetings and whether those promises were false when made. All agree that steps were taken toward a joint bid before Eller told CSI, only a few days before the deadline for submissions, that Eller would not bid with CSI after all. Eller then bid with Adshel and won. CSI bid with others and lost.

CSI then sued Eller, Adshel and Clear Channel in state court. CSI sued Eller for breach of fiduciary duty, breach of the written confidentiality agreement, breach of an oral joint venture agreement, fraud and deceit, common law unfair competition, and violation of the California Trade Secrets Act. It sued Adshel for interference with contract and common law unfair competition, and it sued Clear Channel for common law unfair competition. Defendants removed this action to this court on the basis of diversity. Plaintiff then amended its complaint, alleging that Eller owed CSI fiduciary duties arising out of their confidentiality agreement and an oral joint venture formed between them as partners to bid for the San Francisco newsrack contract.

In January 2001, Judge Charles Legge, to whom this case originally was assigned, denied summary judgment motions filed by defendants as well as plaintiff.[1] On November 21, 2001, partial summary judgment was granted for defendants on CSI's claim that it and Eller formed an oral joint venture to bid for the newsrack contract. The Court held that while in certain contexts contractors may reach an actionable agreement to be a team and to submit a bid together, here no such teaming agreement was formed as the parties merely formed an unenforceable "agreement to agree."

On March 13, 2002, partial summary judgment was granted for defendants on plaintiff's fiduciary-duty claims. Since the Court had already found that the parties had not entered into a joint venture, such an agreement could not have formed the basis of a fiduciary relationship. Furthermore, the order held that the parties were not fiduciaries by virtue of their written confidentiality agreement.

---

1. Judge Legge did not issue a written order.

Trial commenced on September 23, 2002. Plaintiff's contract and fiduciary-duty claims having been eliminated on summary judgment, what remained for the jury were the issues of breach of the confidentiality agreement, fraud, and unfair competition. At the end of plaintiff's case, defendants moved for a directed verdict on all claims. A Rule 50 motion was granted as to defendant Clear Channel Communications only. Defendants renewed their motion for judgment as a matter of law at the close of their case. The motion was denied without prejudice.

By a special verdict returned on October 10, 2002, the jury found Eller liable for $9,000,000 on the fraud claim and $800,000 on the unfair-competition claim. The jury found that Eller had breached the written confidentiality agreement but awarded no damages. It further found that Eller had not misappropriated any trade secret. The jury found no liability for Adshel on plaintiff's unfair-competition claim.

In an extensive motion, Eller moved alternatively for judgment as a matter of law or for a new trial. CSI opposed the motion but failed to cite to any portion of the reporter's trial transcript to support the verdict, leaving the Court to fumble through its own notes of the trial for possible support for the various factual issues in dispute. On December 19, 2002, oral argument was heard. The Court asked plaintiff's counsel about the trial testimony regarding plaintiff's reliance on Eller's fraud. Plaintiff's counsel stated that he could not specifically detail any testimony because plaintiff had not ordered the trial transcripts. Eller's counsel volunteered to provide plaintiff with a copy of all trial transcripts at its own expense. The Court ordered supplemental briefing on the reliance issue. On January 9, 2003, the parties filed simultaneous briefs providing specific trial evidence on plaintiff's detrimental reliance. Both of Eller's motions are addressed together, as the same issues arise under both motions.

## STATEMENT

CSI's fraud claim revolved around three meetings with Eller in San Francisco in 1998. Although the facts were disputed, this order must indulge all reasonable inferences in plaintiff's favor based on the evidence. At these meetings, Eller stated that it would bid with CSI and that it would not bid with Adshel. The latter issue arose because it was known that Eller's corporate parent was then trying to acquire Adshel. At a meeting held on March 31, 1998, CSI's President, Tom Trento, and Executive Vice President, David Hughes, again spoke with William Hooper, President of Eller's Northern California Region, about bidding together. Hooper said that Eller would not bid with Adshel in San Francisco, and that if Eller bid at all in San Francisco, it would be with CSI. In anticipation that they might form a team to bid, on April 2, 1998, CSI and Eller signed a written confidentiality agreement. The agreement allowed the parties to exchange confidential information during their preliminary negotiations but did not create any agency, partnership, or joint venture.[2]

On April 13, 1998, CSI executives again met with Hooper and George Broder, Eller's Public Affairs Manager, and discussed bidding together. On May 21, it was publicly announced that Adshel had been acquired by Eller's parent company, defendant Clear Channel Communications. Because of the acquisition, at a meeting on May 26, Trento of CSI asked Hooper and

---

**2.** Furthermore, as this Court's summary-judgment order determined, this agreement did *not* create a fiduciary relationship.

Broder of Eller if the CSI–Eller team was still going to go forward together. They answered yes. Significantly, however, Trento of CSI testified that at least up to this commitment, Eller had every right to walk away from its negotiations with CSI. The parties had not yet reached agreement on the contents of the bid nor on any joint-venture division of profits; nor did they ever do so.

In this time period, Hooper of Eller decided that he would not bid with CSI after all but would instead bid with Adshel. The parties dispute whether this change occurred shortly before or shortly after the May 26 reaffirmation. This order assumes that it took place before as plaintiff argues (despite strong evidence that it occurred shortly after May 26).

Hooper notified Trento on June 3. He told Trento that the decision was made by "others." Hooper later admitted, however, that in fact the decision to terminate Eller's relationship with CSI was solely his decision. Thereafter, CSI had to scramble to replace Eller in the lineup. CSI prepared a bid utilizing advertising companies Foster Media and Jamison Cawdry instead of Eller. Meanwhile, Eller did not return two copies of a draft bid CSI prepared on May 26 until June 12, in violation of the written confidentiality agreement. Ultimately, San Francisco awarded the bid to Adshel–Eller. The Adshel–Eller bid outscored the CSI–Foster–Jamison bid by seventy-six points, a very substantial margin of victory.

The final jury instructions regarding damages on CSI's fraud (and unfair competition) claims was as follows:

#### XXVIII.

I will now discuss with you the damages that City Solutions may recover for fraud or unfair competition claims. Damages means the amount, if any, which will reasonably and fairly compensate City Solutions for any injury you find was caused by the defendant. In determining the amount of damages, you should consider City Solutions' out-of-pocket costs from March 31, 1998 to June 3, 1998. Out-of-pocket costs are defined as costs paid out of one's own funds.

### ANALYSIS

With respect to the fraud verdict, the threshold issue is whether lost profits can ever be recovered under California fraud law. This order holds that lost profits may be recovered. The issue then reduces to whether in this case the lost profits can be traced to detrimental reliance. This order holds that the trial record fails to support such an award. No reasonable jury could have found that in the absence of detrimental reliance on the false promise, plaintiff would have beaten the winning Adshel–Eller bid.

#### 1. LEGAL STANDARDS.

Judgment as a matter of law pursuant to FRCP 50(b) is proper when the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

A new trial should be granted pursuant to FRCP 59 where the verdict is contrary to the clear weight of the evidence or a "miscarriage of justice" has occurred. *Murphy v. City of Long Beach,* 914 F.2d 183, 187 (9th Cir.1990).

#### 2. FRAUD CLAIM.

Eller "concedes" that the jury was properly instructed on the damages that could

be awarded on plaintiff's fraud claim. Eller contends, however, that this instruction was intended to limit the damages to out-of-pocket costs. Eller argues that the jury misapplied this "correct" instruction and mistakenly awarded damages beyond out-of-pocket losses—so-called "benefit-of-the-bargain" damages—which it maintains are not permitted on a fraud claim. Plaintiff counters that the jury did not award benefit-of-the-bargain damages but rather awarded "lost profits."

### A. The Jury Instruction on Plaintiff's Fraud Claim Did Not Limit Damages to Out–of–Pocket Expenses.

Plainly, the verdict exceeded out-of-pocket damages. Indeed, plaintiff put forth no evidence as to out-of-pocket damages, admitting: "There is no evidence in the record that Plaintiff suffered any damage during [the time period during which it allegedly relied on Eller's promise]" (Pl. Suppl. Opp. Memo at 2). From this, Eller argues that the jury must have misconstrued the instruction to authorize benefit-of-the-bargain damages.

As noted above, Instruction XXVIII of the Final Charge to the Jury, stated:

I will now discuss with you the damages that City Solutions may recover for fraud or unfair competition claims. Damages means the amount, if any, which will reasonably and fairly compensate City Solutions for any injury you find was caused by the defendant. In determining the amount of damages, you should consider City Solutions' out-of-pocket costs from March 31, 1998 to June 3, 1998. Out-of-pocket costs are defined as costs paid out of one's own funds.

In the joint set of proposed jury instructions, plaintiff had submitted an instruction that proposed compensation for all the loss suffered by it and caused by any

fraud. The proposed instruction had been almost identical to the one in BAJI 12.57. The first paragraph of the BAJI instruction states:

If you find that plaintiff is entitled to a verdict against the defendant, you must then award plaintiff damages in an amount that will reasonably compensate for all the loss suffered by plaintiff and caused by the fraud upon which you base your finding of liability.

BAJI 12.57, in turn, is based on California Civil Code Sections 1709 and 3333. Plaintiff's proposed instruction omitted BAJI 12.57's second paragraph (not quoted above), which had specifically referred to and defined "benefit of the bargain" damages.

In its pretrial submissions, Eller opposed plaintiff's proposed instruction. It argued that "the benefit of the bargain is not the measure of damages for any of City Solutions's remaining claims. All of City Solutions's contract claims have been eliminated by this Court in prior summary judgment orders" (Joint Set of Proposed Jury Instructions). Eller did not argue, however, that the correct measure of damages for fraud was limited to out-of-pocket costs. Eller failed, for example, to address the recoverability of lost profits.

As the trial neared its end, the Court provided its draft charge to counsel on October 1. The Court offered the above-quoted instruction, which became the final one. At the first charging conference, Eller's counsel requested that the phrase "if any" be inserted after the word "damages" in the first sentence. The Court proposed, instead, inserting the phrase "if any" after the word "amount" in the second sentence. Neither party objected to this. Both parties also stated that there were no further objections to the instruction.

Taking into account all objections, the complete set of draft instructions were

then revised twice. At each charging conference, the parties were given an opportunity to object on the record. The parties were told that any objections made in the pretrial submissions should be repeated or they would be deemed waived. None were made.

■ Eller now contends that it did not object to the instruction because it "understood" it to limit damages to out-of-pocket recovery. One issue, then, is whether this view was correct. This order rejects Eller's interpretation. Damages were not limited to out-of-pocket recovery by the language used. Instructing the jury that it *should* consider out-of-pocket losses did not *limit* damages to out-of-pocket losses. The instruction plainly stated that damages should be awarded for "*any* injury" caused by defendant's fraud, which could include lost profits. Rather than rest on this ground alone, however, this order will review the California caselaw, a review that confirms that lost profits (as opposed to benefit-of-the-bargain damages) are a proper recovery item, if proven up, under Civil Code Section 3333, as now explained.

### 3. CALIFORNIA FRAUD LAW ALLOWS RECOVERY OF LOST PROFITS BUT NOT BENEFIT-OF-THE-BARGAIN DAMAGES.

■ It is worthwhile to begin with the two statutes in question. California Civil Code Section 3333 (entitled "Measure of damages") provides:

> For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.

Section 1709 (entitled "Fraudulent deceit") provides:

> One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.

These provisions were enacted in 1872. Many of the early decisions concerned land fraud. Courts held that the defrauded party was entitled to recover the difference between the actual value of what he received and the value the property would have had if the representations had been true. *E.g., Jackson v. Deauville Holding Co.*, 219 Cal. 498, 500, 27 P.2d 643 (1933). This was termed "benefit-of-the-bargain" damages. Such damages were contrasted with "out-of-pocket" damages, which were the difference between the value of what the defrauded party parted with and the value of the property he received. *Jacobs v. Levin*, 137 P.2d 500, 58 Cal.App.2d Supp. 913, 915–17 (1943). Thus, prior to 1935, the measure of damages for torts under Section 3333 was ordinarily the same as that for breach of contract provided by Section 3300. *Ruzanoff v. Retailers Credit Ass'n*, 97 Cal.App. 682, 687, 276 P. 156 (1929); *Siminoff v. Jas. H. Goodman & Co. Bank*, 18 Cal.App. 5, 15–16, 121 P. 939 (1912).

In 1935, California Civil Code Section 3343 was enacted.[3] It adopted the out-of-pocket standard (and eliminated benefit-of-the-bargain damages) for fraud by a vendor or vendee in the purchase, sale or

---

3. The 1935 version of Section 3343 provided: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction. [Para.] Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

exchange of property. Despite this, however, it "became settled under the 1935 statute that anticipated revenue or profit, although not a proper measure of damages or a proper component of 'additional' damages, could still be considered in determining the value of the property received. (See *Eatwell v. Beck* (1953) 41 Cal.2d 128, 134 [257 P.2d 643].).)." *Stout v. Turney*, 22 Cal.3d 718, 726, 150 Cal.Rptr. 637, 586 P.2d 1228 (1978). In *Stout*, the California Supreme Court explained how Section 3343 was later amended (in 1971) to adopt a lost-profits provision to bring it into sync with the general measure for fraud under Section 3333:

> It was in the context of the foregoing course of judicial evolution that the 1971 Legislature addressed itself to the amendment of section 3343. Also apparent to the lawmakers was the fact that certain logical inconsistencies existed between the judicial application of the 1935 statute and that of other enactments dealing with the measure of damages for fraud. **Thus, in fraud cases not involving the "purchase, sale or exchange of property" lost profits were regularly awarded under the general tort recovery statute, Civil Code section 3333** (see, e.g., *Sutter v. General Petroleum Corp.* (1946) 28 Cal.2d 525, 534 [170 P.2d 898, 167 A.L.R. 271] ) . . . The Legislature's response took the form of an extensive amendment to and expansion of that portion of the former section dealing with consequential or 'additional' damages . . . the section was amended to permit the recovery of lost profits as a component of 'additional' damage. (Subds.(a)(3) and (a)(4).) Care was taken, however, to emphasize that the above amendments were not to be interpreted as the adoption of a "benefit-of-the-bargain" standard, which would of course be applicable regardless of whether the subject property was income- or profit-producing.

*Stout*, 22 Cal.3d at 726–27, 150 Cal.Rptr. 637, 586 P.2d 1228 (emphasis added).[4] Thus the California Legislature drew a clear distinction between benefit-of-the-bargain damages and lost profits. "As pointed out above, a loss-of-profits standard is not the same as a 'benefit-of-the-bargain' standard. The former applies only where there are reasonably anticipated 'profits or other gains.'" *Id.* at 729 n. 12, 150 Cal.Rptr. 637, 586 P.2d 1228. Fur-

---

4. The current version of Section 3343, fraudulent property sales, reads in part:

(a) One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including any of the following:

\* \* \* \* \* \*

(3) Where the defrauded party has been induced by reason of the fraud to sell or otherwise part with the property in question, an amount which will compensate him for profits or other gains which might reasonably have been earned by use of the property had he retained it.

(4) Where the defrauded party has been induced by reason of the fraud to pur-chase or otherwise acquire the property in question, an amount which will compensate him for any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud, provided that lost profits from the use or sale of the property shall be recoverable only if and only to the extent that all of the following apply . . .

(b) Nothing in this section shall do either of the following:

(1) Permit the defrauded person to recover any amount measured by the difference between the value of property as represented and the actual value thereof. . . .

thermore, *Stout* specifically noted that Section 3333 provided for lost profits. This order deems that authority controlling.

The present case involves a fraudulent promise to submit a joint bid, *not* fraud in the sale or exchange of property. Nonetheless, the caselaw is reasonably clear that Sections 3333 and 1709 still do not authorize benefit-of-the-bargain damages (with the sole possible exception of fraud by fiduciaries). The basic reason is that the statute authorizes damages only to "compensate for all the detriment proximately caused" by reliance on a fraud. Detrimental reliance focuses only on how the victim would have fared had there been no reliance on any fraud and restores the victim accordingly. Benefit of the bargain, which is the traditional *contract* measure of damages, focuses on the promise. It holds the wrongdoer to the promise.

The most persuasive and exhaustive recent treatment of this distinction under California law is Judge Roslyn Silver's order in *Southern Union Co. v. Southwest Gas Corp.*, 180 F.Supp.2d 1021 (D.Ariz. 2002). Her order performed a grand-scale review of California authority in the context of a fraudulent-inducement claim. *Southern Union* started with an acknowledgment of the availability of "lost profit" damages and a note that they must be proven with reasonable certainty. *Id.* at 1035 (*citing Mann v. Jackson*, 141 Cal. App.2d 6, 12, 296 P.2d 120 (1956)) ("It is

well established that damages may be awarded for loss of profits where such profits can be shown with a reasonable degree of certainty, whether the action be for tort or for breach of contract").[5] As for benefit-of-the-bargain damages, however, the following passage explained why they were unrecoverable:

> [R]elying on *Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 44 Cal. Rptr.2d 352, 900 P.2d 601 (1995) and Cal. Civ.Code §§ 3333 (damages for torts in general) and §§ 1709 (damages for deceit), Southern Union claims that "benefit of the bargain damages are also available under fraud." (*Id.* at 29, 296 P.2d 120). Under this damages theory, Southern Union could prove its damages by showing that it would have merged with Southwest and profited from the merger if, as allegedly promised, Southwest had conducted a good faith evaluation of Southern Union's merger offer. This theory seems inconsistent with a fraudulent inducement claim, however, because justifiable reliance is an essential element of the claim; such reliance exists when, absent the misrepresentation, the allegedly defrauded party would *not* have entered into the bargain. See, e.g., *Engalla v. Permanente Med. Group, Inc.*, 15 Cal.4th 951, 64 Cal. Rptr.2d 843, 859, 938 P.2d 903 (1997). Here, Kelley testified that if Southern Union had known that Southwest would *not* evaluate Southern Union's offer in

**5.** In *Southern Union*, the plaintiff's claim following the failure of a proposed merger alleged that the defendant made false representations for the purpose of inducing it to forego alternative takeover options. The court first analyzed whether plaintiff was entitled to lost profits. This required the plaintiff to show that if it had not relied on the misrepresentation, it would not have entered into a contract with defendant and instead would have made a successful and profitable tender offer to the defendant's shareholders. The court refused to grant lost profits, so-called "opportunities foregone," because plaintiff could not demonstrate them with the required certainty. *Id.* at 1037 (referring to such damages as "typical damages that would make Southern Union whole by putting it in the position it would have been in absent" the fraud). *Second,* the plaintiff's claim for benefit-of-the-bargain damages based on fraudulent inducement was not granted, as the court determined such damages were not available under the law.

good faith, Southern Union would *not* have entered into the Standstill Agreement. (Kelley Aff. P5). Southern Union acknowledges that "it may seem slightly inconsistent that fraud nullifies a contract and then provides you with benefit of the bargain damages," but argues that "we live with that slight inconsistency because [we are] trying to punish the fraud-feasor and [we are] trying to *make the victim of the fraud whole.*" (8/24/01 Hr'g Tr. at 29) (emphasis added). Damages that *make Southern Union* whole, however, are technically tort damages, not benefit-of-the-bargain damages.

*Id.* at 1037–38 (emphasis in original).

The court concluded that California's Sections 1709 and 3333 "do not provide benefit-of-the-bargain recovery." *Id.* at 1040–41.

> "[Southern Union's] position is not supported by the main line of case authority." *Eckert Cold Storage, Inc. v. Behl,* 943 F.Supp. 1230, 1234 (E.D.Cal.1996). "Under this precedent, [Civil Code § ] 3333 does not provide benefit of the bargain recovery[.]" *Id.* (citing *Alliance Mortgage,* 44 Cal.Rptr.2d at 367, 900 P.2d 601; *Gray,* 198 Cal.Rptr. 551, 674 P.2d at 255; *Kenly,* 19 Cal.Rptr.2d at 774; *Christiansen,* 231 Cal.Rptr. at 78). "Rather, [Southern Union's] recovery [for fraudulent inducement] must be limited to the losses proximately caused by [Southwest's] alleged misrepresentations: the damages awarded should place [Southern Union] in the position [it] would have occupied had the misrepresentations not occurred." *Eckert Cold Storage,* 943 F.Supp. 1230 (citing *Gray,* 198 Cal.Rptr. 551, 674 P.2d at 255; *Kenly,* 19 Cal.Rptr.2d at 774); see *Auble v. Pacific Gas & Elec. Co.,* 55 F.Supp.2d 1019, 1022–23 (N.D.Cal.1999) ("In California, in the absence of a fiduciary relationship, recovery for the tort of fraud is limited to the actual, out-of-pocket damages suffered by the plaintiff.") (citations omitted).

*Id.* at 1041 (footnotes omitted). This order agrees with that court's conclusion.

Although Judge Silver's decision was a federal decision, California state courts have held similarly. *E.g., Christiansen v. Roddy,* 186 Cal.App.3d 780, 790, 231 Cal. Rptr. 72 (1986):

> "A plaintiff in a tort action is not, in being awarded damages, to be placed in a better position than he would have been had the wrong not been done." ( *Valdez v. Taylor Automobile Co.* (1954) 129 Cal.App.2d 810, 821–822 [278 P.2d 91].) Here, "had the wrong not been done," i.e., had the misrepresentation not been made, respondents would presumably not have made their investments; while it would have been proper to award them their $60,000 (less equity) and interest at the legal rate, it was improper for the court below to put respondents in a better position than they would have been had they not been deceived (and therefore not invested their money at 20 percent interest). To carry the matter one step further, there was no evidence nor can it be presumed that the respondents would have received with sufficient certainty a 20 percent annual return for some other $60,000 investment for three years.

In contrast, California caselaw has regularly recognized the availability of lost profits as a general damage item when the lost profits flowed from detrimental reliance. As explained in *Lucky Auto Supply v. Turner,* 244 Cal.App.2d 872, 53 Cal. Rptr. 628 (1966):

> "It is well established in California, moreover, that such [fraud] damages may include loss of anticipated profits where an established business has been injured." (*Natural Soda Products Co. v. City of Los Angeles,* 23 Cal.2d 193,

199 [143 P.2d 12]; *Hoag v. Jenan*, 86 Cal.App.2d 556, 563 [195 P.2d 451]; *Guttinger v. Calaveras Cement Co.*, 105 Cal. App.2d 382, 387 [233 P.2d 914]; *Yates v. Kuhl*, 130 Cal.App.2d 536, 542 [279 P.2d 563].) The basis of this principle is that where the operation of an established business is prevented or interrupted by a tort, damages for loss of prospective profits, that otherwise might have been made from its operation, are ordinarily recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the working experience of the business, from the past volume of business, and other provable data relevant to the probable future sales. *Grupe v. Glick*, 26 Cal.2d 680, 692–693 [160 P.2d 832]; *Hoag v. Jenan, supra*, at 563, 195 P.2d 451; *Gainer v. Storck*, 169 Cal.App.2d 681, 687 [338 P.2d 195]; *Edwards v. Container Kraft Carton etc. Co.*, 161 Cal. App.2d 752, 759–761 [327 P.2d 622].

*Id.* at 882, 53 Cal.Rptr. 628 (*quoting Fireboard Paper Products Corp. v. East Bay Union of Machinists, Local 1304*, 227 Cal.App.2d 675, 702–703, 39 Cal.Rptr. 64 (1964)); *accord Johnson v. Cent. Aviation Corp.*, 103 Cal.App.2d 102, 105–06, 229 P.2d 114 (1951) (where defendant's tortious act prevented sale of the plaintiff's plane, plaintiff could recover lost sale profits under Section 3333); *Edward Barron Estate Co. v. Woodruff Co.*, 163 Cal. 561, 578, 126 P. 351 (1912); *Peters v. Southern Pacific Co.*, 160 Cal. 48, 67–68, 116 P. 400 (1911); *Hawthorne v. Siegel*, 88 Cal. 159, 163–65, 25 P. 1114 (1891) (loss of profit damages

upheld where plaintiffs were compelled by defendants to abandon their barber business).

*Lazar v. Superior Court*, 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996), cited by both sides, exemplifies the distinction between lost-profit and benefit-of-the-bargain damages. *Lazar* held that the lost profits sought on a fraud claim were not recoverable. The lost profits at issue— sought for fraudulent inducement to contract—were *in fact* benefit-of-the-bargain damages. As to lost-profit damages generally, however, the court re-affirmed the California Supreme Court's finding in *Stout*, 22 Cal.3d at 725, 150 Cal.Rptr. 637, 586 P.2d 1228, that lost profits are recoverable for fraud. *Id.* at 646, 150 Cal.Rptr. 637, 586 P.2d 1228.[6]

To be sure, there is confusing authority that, at least superficially, loses track of the foregoing distinction and makes oversimplified and incorrect statements of the law. To take an example, *Auble v. Pac. Gas & Elec.*, 55 F.Supp.2d 1019, 1022 (N.D.Cal.1999), stated: "[I]n the absence of a fiduciary relationship, recovery for the tort of fraud is limited to the actual, out-of-pocket damages suffered by the plaintiff." *Auble's* statement was too broad. In the case of a fiduciary relationship, some California courts have held that a plaintiff can recover not only out-of-pocket damages, but also benefit-of-the-bargain damages. Thus, *Auble* stated that the reverse was true. But *Auble* simply overlooked the possibility, which did not apply in that case, that in the absence of a fiduciary

6. *Lazar* also provided a confusing passage upon which plaintiff relied: "fraud plaintiffs may recover 'out-of-pocket' damages in addition to benefit-of-the-bargain damages." *Ibid.* In that case, the plaintiff had been induced to enter into an employment contract, which the employer soon terminated. Thus, in the case of this promissory fraud, the plaintiff was entitled to recover his out-of-pocket expenses under Section 3333: the costs of uprooting his family, his expenses incurred in relocation and the loss of future income associated with his former employment. Plaintiff also was entitled to recover his benefit-of-the-bargain— the loss of income caused by the termination—but *those* damages were based on his *contract* claim. 12 Cal.4th at 646, 49 Cal. Rptr.2d 377, 909 P.2d 981.

relationship, lost profits still may be recovered.

Eller cites *Savini Constr. v. Crooks Bros. Constr. Co.*, 540 F.2d 1355 (9th Cir. 1974), for its dicta that a losing bidder could obtain only preparation costs and not lost profits.[7] The court's rationale, however, relied upon the fact that the profits were too speculative. *Id.* at 1359 n. 9. Implicitly then, the court acknowledged the general availability of lost-profit damages. The court did not, as Eller asserts, rely on the principle that lost profits are unavailable in the fraud context. Lost profits—properly defined—clearly are generally available.

This order must also acknowledge that its holding is in some tension with the "use note" to BAJI 12.57, entitled Fraud and Deceit–Damages–Benefit of the Bargain Rule. The use note explains that BAJI 12.57 applies only to fraudulently-induced transactions other than the purchase, sale or exchange of property, real or personal. To the extent that this order contradicts BAJI 12.57, this Court rejects that authority. As the court in *CRSS Commer. Group, Inc. v. Toothman*, 52 Cal.App.4th 1438, 61 Cal.Rptr.2d 673 (1997) explained:

> BAJI No. 12.57 is neither a statute nor a court opinion and has no precedential value in and of itself. Moreover, although BAJI 12.57 does indeed instruct that benefit of the bargain damages may be awarded to a plaintiff in a fraud action, the authorities cited in the Use Notes to the instruction do not stand for that proposition. In *Gagne v. Bertran*, 43 Cal.2d 481, 490, 275 P.2d 15 (1954), the court held only that "damages whether for deceit, or negligence, must be measured by the actual losses suffered because of the misrepresentation." The court in *Roberts v. Karr*, 178 Cal. App.2d 535, 542, 3 Cal.Rptr. 98 (1960) merely cited the holding in *Gagne* as authority for the same conclusion. Indeed, the *Roberts* court at 543–544, 3 Cal.Rptr. 98 specifically recognized that *Gagne* does *not* support an award of benefit of the bargain damages in a fraud action. There is authority for a finding that in some cases benefit of the bargain damages may be awarded for fraud committed by a fiduciary. [citations omitted] *Toothman* was not, however, CRSS's fiduciary.

*Id.* at 1444, 61 Cal.Rptr.2d 673.

Put differently, the use note is simply contrary to California caselaw (and the caselaw so states). Presumably, the use note will eventually be updated but it lingers on as a source of confusion. Benefit-of-the-bargain damages are available in fraud cases involving a fiduciary, according to some authorities (but not others), so the instruction itself continues to have utility.[8]

---

**7.** The central issue in the case regarded whether a private civil cause of action could be inferred from the Small Business Act, 15 U.S.C. 631. The court determined that it could not. The court went on to state that even if a cause of action were to be inferred, plaintiff could not recover lost profits because they were too speculative.

**8.** The California Supreme Court has ruled that fraud by a fiduciary is governed by Section 3333 and not Section 3334, even though the fraud involved the purchase or sale of property. *Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 1241, 44 Cal.Rptr.2d 352,

900 P.2d 601 (1995). But the caselaw is split on whether a fiduciary's damages are to be measured by the out-of-pocket standard or the benefit-of-the-bargain standard. *Id.* at 1249, 44 Cal.Rptr.2d 352, 900 P.2d 601; *compare Hensley v. McSweeney*, 90 Cal.App.4th 1081, 109 Cal.Rptr.2d 489 (2001); *Christiansen v. Roddy*, 186 Cal.App.3d 780, 790, 231 Cal. Rptr. 72 (1986); *Overgaard v. Johnson*, 68 Cal.App.3d 821, 826–828, 137 Cal.Rptr. 412 (1977), *with Salahutdin v. Valley of Cal., Inc.*, 24 Cal.App.4th 555, 565–68, 29 Cal.Rptr.2d 463 (1994); *Pepitone v. Russo*, 64 Cal.App.3d 685, 688, 134 Cal.Rptr. 709 (1976).

Finally, both parties confuse the benefit-of-the-bargain rule for cases specifically involving a fiduciary relationship with the general background rules regarding the availability in fraud cases. Both parties acknowledge that with regard to cases involving a fiduciary relationship, there is a split of authority on the availability of benefit-of-the-bargain damages. Per the summary judgment ruling in this case, no fiduciary relationship was at play in this trial. For this reason, most of the cases cited in the moving papers on this motion are inapposite.

As the foregoing analysis shows, under California law there is a recognized difference between lost profits and benefit-of-the-bargain damages. While benefit-of-the-bargain damages are not recoverable for fraud under Sections 1709 and 3333, lost profits are recoverable (if proven). As Section 3333 states, plaintiffs are entitled to recover "all the detriment" caused by the fraud. Accordingly, this order finds that there was no error in the jury instruction, as it allowed for recovery based on a lost-profits theory.

To summarize, fraud actions allow recovery for all loss proximately caused by detrimental reliance on a fraud. Where a victim would have earned profits had it not relied to its detriment on a fraud, then the victim may recover lost profits. This is true as well where the fraud happens to be a false promise. But the victim cannot go further and hold the wrongdoer to its promise. A jury cannot award the victim the benefit of the bargain, for to do so would leap beyond the scope of detrimental reliance and would award contract damages. In fraudulent-promise cases, the temptation will loom large to hold the fraudulent promisor to its promise and thereby transgress this distinction. The temptation must be resisted. In a fraud case, we must always return to the key question—how did the victim actually rely to its detriment on the false promise. Or, put differently, how would the outcome have differed had the false promise not been made or relied upon.

### 4. PLAINTIFF'S EVIDENCE DID NOT SUPPORT AN AWARD OF LOST-PROFIT DAMAGES.

■ Even though lost profits can be proper damage items in a fraud case, plaintiff still must prove causation through detrimental reliance. As noted above, in a fraudulent-promise case, there is an ever-present temptation to hold the wrongdoer to its promise and to award benefit-of-the-bargain recovery rather than any lost profits actually caused by detrimental reliance.

In the present case, there is a strong record to support plaintiff's general claim that it was misled as to Eller's intentions. Plaintiff concedes, however, that up until May 26, 1998, Eller was free to walk away from the potential joint bid with plaintiff (at least so long as Eller did not join forces with Adshel).[9] At the May 26 meeting, plaintiff's witnesses testified that Eller expressly recommitted to a joint bid with plaintiff. In reliance on this promise, plaintiff refrained from seeking other teaming partners and continued to work on the joint Eller–CSI proposal. When CSI was told on June 3 that Eller would not bid with them, CSI had to find another advertising and financing partner. No doubt exists that the out-of-pocket expenses incurred on CSI's work between

---

9. Mr. Trento of CSI admitted that, had Eller dropped out of the potential joint bid at the May 26 meeting, he would have been "disappointed" and "hurried, but I would not view that at all as deception" (Trento 9/24/02 at 130). He testified: "We had no gun or big gigantic contract forcing them, you have to do it with us. They could leave any time they want, but they really shouldn't deceive us, couldn't deceive us" (*ibid.*).

May 26 and June 3 on the Eller bid would have been recoverable (although, as it turns out, plaintiff concededly proved no such expenses at trial).

As for lost profits, the proper comparison must be between the scenario had plaintiff not relied on the false promise versus the actual scenario. *In both, Eller would have bid with Adshel.* This is a key and critical point. Given that, one potential difference might have been that plaintiff could have arranged for a better teaming partner. Plaintiff, however, put in no proof on this score. Given the large margin of victory for Eller–Adshel, it would be hard to conclude that plaintiff could have found a partner to overcome the deficit.

More specifically, the RFP notified potential bidders that they would be assessed on the basis of four categories of selection categories: (1) approach/experience (20 points); (2) aesthetics/design (30 points); (3) operation/maintenance (20 points); and (4) economic factor (30 points). Only two of the categories in which the evaluators assigned points to the submissions could have even arguably been affected by Eller's alleged fraud: (1) approach/experience (20 points), in which one of four criteria was "experience in the sale and maintenance of outdoor advertising in an urban area," and (2) aesthetics/design (30 points), in which one of the six criteria was "incorporates public service messages." In the approach/experience category, Adshel outscored CSI by six points, and in the aesthetics/design category, Adshel outscored CSI by 21 points. Overall, however, Adshel outscored CSI by 76 points—a much greater margin than the 27–point difference between the two bidders in these categories.

Moreover, the failure to obtain a better teaming partner is not the ground on which CSI relies. Significantly, CSI states: "City Solutions was *not* hurt by having to bid with the two companies that replaced Eller, Foster Media and Jamison Cawdry. City Solutions suffered no damages by bidding with these replacement companies" (Pl. Suppl. Opp. Memo at 3–4) (emphasis in original). CSI put forth almost no argument regarding how it suffered in reliance on Eller's fraud, instead emphasizing the detailed testimony of the promises Eller made. CSI merely stated that it "suffered damages because Eller solicited Adshel to bid and joined with Adshel to bid against City Solutions" (*id.* at 4).

A second form of possible detrimental reliance on the false promise that might have affected the scenario was that plaintiff shared its secret bidding strategy with Eller and Eller then used it in constructing its own strategy with Adshel. CSI introduced evidence that it shared with Eller its strategy of proposing ad faces on 500 of the 1000 newsracks (rather than some other percentage) and not proposing revenue sharing with the city (revenue sharing being a possible inducement for the city). The Adshel–Eller bid later proposed ads on 450 newsracks and proposed revenue sharing.[10] Even assuming that Eller did in fact misuse the information in this way, however, CSI does not now contend that in the absence of this sharing, it would have won the bid. The final scoring was so lop-sided that CSI does not even attempt to point to any way in which the use of its strategy would have changed the outcome.

Perhaps in recognition of these shortcomings, plaintiff now rationalizes the causation on a different ground—one that upon examination, reduces to an impermissible contract theory, not a fraud theory.

---

**10.** The final contract between Adshel and the city called for ads on 485 newsracks and eliminated revenue sharing.

The real wrong, plaintiff says, was not in Eller's pulling out of the joint bid, but was in Eller's doing what it had promised back in March it would not do, namely that it would not bid with Adshel.[11] This promise was made on March 31, 2002. It was not restated on May 26. Nonetheless, plaintiff contends that the jury could have reasonably found that the promise not to bid with Adshel was one on which plaintiff was still relying on May 26. For purposes of this order, it is assumed that the promise was made on March 31 and was not in any way qualified, as defendant contends, and that it would have been reasonable for plaintiff to rely thereon in proceeding to deal with Eller at all times thereafter. Nonetheless, for purposes of the fraud cause of action, we still must isolate how the reliance thereon altered the scenario that otherwise would have occurred. We must not hold Eller to its promise, for that would be an impermissible contract recovery, previously barred in this case. We must take it as a given that Eller broke its promise and bid with Adshel anyway and then ask what plaintiff would have done in the absence of the false promise or reliance thereon.

The truth is that given the strength of the Eller–Adshel bid, there is *no scenario* by which a jury could have reasonably concluded that plaintiff could have won the bid, either alone or in combination with anyone other than Eller. Once again, as to the fact that plaintiff shared its bidding strategy and had to scramble at the eleventh-hour, the same holds. In fact, CSI now emphasizes that Eller "figured prominently in Adshel's RFP response" and ar-

gues that the mere presence of Eller would have been outcome-determinative for any Eller team. CSI points to the fact that five sections of Adshel's proposal spoke of Eller, its "history, key personnel, marketing capabilities, and references," and that Eller's executives "played a major role in the oral interview with the City and the evaluators" (Pl. Suppl. Opp. Memo at 12). Thus, CSI seems to concede that any bid involving Eller was going to win and beat whatever proposal CSI and its partner put forth.

Had the bids been closer, a jury could reasonably have found that the eleventh-hour scramble prejudiced plaintiff. In that case, the verdict would have to be sustained. Had the bids been closer and the secret bidding data a deciding factor, the verdict likewise would have to be sustained. But the record does not come close to supporting either scenario. As for out-of-pocket expenses, which normally would have been recoverable, plaintiff failed to prove any. Instead, plaintiff chose to rest everything upon a lost-profits theory.

Accordingly, plaintiff failed to prove any loss in reliance on Eller's false promise or misrepresentation. Defendant's motion for judgment as a matter of law is **GRANTED**, and defendant's motion for a new trial is **DENIED** as moot.

5. MOTION TO SET ASIDE THE JURY'S VERDICT ON PLAINTIFF'S UNFAIR-COMPETITION CLAIM.

Eller contends that plaintiff did not provide sufficient evidence to establish un-

---

11. At the hearing on this motion, plaintiff emphasized that the proper comparison was not to compare the scores on CSI's bid to the Eller–Adshel bid, but rather whether CSI would have beaten Adshel if the latter wasn't joined by Eller. Plaintiff argued the Court should look at what would be different if Eller "had simply dropped out," and emphasized that this was different than Eller simply "put-

ting its efforts into someone else's team." This demonstrates precisely the problem with plaintiff's theory. Plaintiff seeks to hold Eller to its promise that if it bid in San Francisco, it would do so with CSI. But without holding Eller to that promise as a contract, the Court must assume that if Eller had not made the fraudulent promise, Eller still would have put "its efforts into someone else's team."

fair competition by a preponderance of the evidence and moves to set aside the finding of liability. To prevail on its common law unfair-competition claim, CSI was required to prove by a preponderance of the evidence that: "City Solutions has invested substantial time and money in development of its property; Defendant(s) misappropriated the property at little or no cost; and City Solutions was injured by the defendant(s)' conduct" (Jury Instruction XXII). For purposes of this claim, the jury was instructed that "property" was "not limited to physical or tangible property. The term property can include a confidential and proprietary business strategy developed to respond to the RFP of the City and County of San Francisco" (Supplemental Jury Instructions).

Eller maintains that at trial, plaintiff claimed that Eller had misappropriated bidding strategies and trade secrets from plaintiff, and that no other evidence was urged as a basis for plaintiff's unfair-competition claims. The jury found that Eller was not liable on the trade-secrets claim. Eller therefore argues essentially that no reasonable jury could then find Eller liable for unfair competition. It contends that since the jury concluded Eller did not violate the Trade Secrets Act and that Adshel did not engage in unfair competition, there "is nothing in the record to support any finding that Adshel used any "trade secret" or any "bidding strategy" to plaintiff's detriment." Eller also maintains that the record is devoid of any evidence that Adshel used a bidding strategy to the detriment of plaintiff.

This is incorrect. Plaintiff put forth evidence that Eller misappropriated CSI's strategy of proposing 500 ad faces and not proposing revenue sharing. This order finds that the jury's verdicts are not necessarily inconsistent. A finding of liability on the trade-secrets cause of action required different elements than the unfair-competition cause of action. For one, on the trade-secrets claim, the jury had to find that the claimed trade secrets were capable of protection as trade secrets. Additionally, the jury also had to find that Eller knew or had reason to know that it had a duty to maintain the trade secrets or limit their use. The jury reasonably could have found that Eller misappropriated a bidding strategy that plaintiff put a substantial amount of time and money into but which was not capable of protection as a trade secret.

Accordingly, Eller's motion for judgment as a matter of law on plaintiff's unfair-competition claim is **DENIED**. Furthermore, because Eller has not demonstrated that there was any "miscarriage of justice," nor that the verdict was contrary to the clear weight of the evidence, Eller's motion for a new trial is **DENIED**.

### 6. MOTION TO SET ASIDE THE JURY'S DAMAGES AWARD ON PLAINTIFF'S UNFAIR-COMPETITION CLAIM.

■ Eller claims that the jury's damages award on plaintiff's unfair-competition claim is arbitrary and is contrary to law. The jury instruction for unfair competition was included in the instruction for fraud. Accordingly, the same analysis applies to the determination of the appropriate damage award for such a tort. As with plaintiff's fraud cause of action, while benefit-of-the-bargain damages might not have been available, lost profits were. Furthermore, the jury instruction authorized an award for the amount which would "reasonably and fairly compensate City Solutions for any injury you find was caused by the defendant."

This order cannot say that as a matter of law the jury's award was not supported by the record. Once the jury found that Eller misappropriated CSI's property, it may have awarded such damages to com-

pensate CSI for its worry regarding Eller's misuse of its confidential information, which was exacerbated by Eller's late return of CSI's draft bid on June 12. Likewise, on this record, it may have awarded such damages on the theory that Eller misused CSI's business acumen that had intrinsic value, i.e., that Eller callously "went to school" on CSI, sapped CSI of its know-how and, having gone to school and learned the newsrack business at CSI's expense, put in the winning bid. Thus, apart from just losing the bid, the jury may have compensated CSI for its expenditure of time and effort teaching Eller about the modular-newsrack business. Accordingly, Eller's motion to overturn the damages award or for a new trial is **DENIED.**

## CONCLUSION

For the foregoing reasons, judgment must be entered for Eller Media Company on the fraud claim. The jury's verdict and damage award against Eller Media Company on the unfair-competition claim will stand. Defendant's motion for a new trial is **DENIED.**

**IT IS SO ORDERED.**